# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LAUREL PARK COMMUNITY, LLC, a
Washington limited liability
company; TUMWATER ESTATES
INVESTORS, a California limited
partnership; VELKOMMEN MOBILE
PARK, LLC, a Washington limited
liability company; and
MANUFACTURED HOUSING
COMMUNITIES OF WASHINGTON, a
Washington nonprofit corporation,
            *Plaintiffs-Appellants,*

                v.

CITY OF TUMWATER, a municipal
corporation,
            *Defendant-Appellee.*

No. 11-35466

D.C. No.
3:09-cv-05312-BHS

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted
August 8, 2012—Seattle, Washington

Filed October 29, 2012

Before: John T. Noonan, Susan P. Graber, and
Johnnie B. Rawlinson, Circuit Judges.

Opinion by Judge Graber

12955

## COUNSEL

Philip A. Talmadge, Talmadge/Fitzpatrick PLLC, Tukwila, Washington, for the plaintiffs-appellants.

Jeffrey S. Myers, Law, Lyman, Daniel, Kamerrer & Bogdanovich, P.S., Olympia, Washington, for the defendant-appellee.

Daniel A. Himebaugh, Pacific Legal Foundation, Bellevue, Washington, for the amicus curiae.

## OPINION

GRABER, Circuit Judge:

Defendant City of Tumwater enacted two ordinances that seek to preserve the existing stock of manufactured home

parks within the municipality by limiting the uses of certain properties. Plaintiffs are three of the affected property owners —Laurel Park Community, LLC; Tumwater Estates Investors; and Velkommen Mobile Park, LLC—and a nonprofit entity, Manufactured Housing Communities of Washington. Plaintiffs allege that the ordinances, on their face, violate various constitutional provisions. The district court held that the facial constitutional challenges fail and granted summary judgment to Defendant. On de novo review, *Strategic Diversity, Inc. v. Alchemix Corp.*, 666 F.3d 1197, 1205 (9th Cir. 2012), we affirm.

## FACTUAL AND PROCEDURAL HISTORY

### A.  *Manufactured Homes*

The term "manufactured homes" describes a type of housing that typically is not constructed at the installation site. *See generally* Werner Z. Hirsch & Joel G. Hirsch, *Legal-Economic Analysis of Rent Controls in a Mobile Home Context: Placement Values and Vacancy Decontrol*, 35 U.C.L.A. L. Rev. 399 (1988). Originally called "mobile homes," early versions were no more than travel trailers hitched to the back of a car. Mobile homes can be moved from one site to another, allowing the owner to change locations without changing housing.

Over time, however, the predominant use of this type of housing began to shift toward a more fixed use. Occupants installed a "mobile" home in a fixed location and lived in it year-round. In 1974, recognizing that these homes were more akin to permanent dwellings than to travel trailers, Congress enacted the National Mobile Home Construction and Safety Standards Act of 1974, Pub. L. No. 93-383, 1974 S. 3066, §§ 601-628 (now codified at 42 U.S.C. §§ 5401-5426). That statute authorized the Department of Housing and Urban Development to regulate the construction and safety of mobile homes. In 1980, Congress replaced nearly all references to

"mobile home" with "manufactured home." Pub. L. No. 96-399, § 308(c).

As the Supreme Court has noted, "[t]he term 'mobile home' is somewhat misleading." *Yee v. City of Escondido*, 503 U.S. 519, 523 (1992).

> Mobile homes are largely immobile as a practical matter, because the cost of moving one is often a significant fraction of the value of the mobile home itself. They are generally placed permanently in parks; once in place, only about 1 in every 100 mobile homes is ever moved.

*Id.*; *see also Manufactured Hous. Cmtys. of Wash. v. State*, 13 P.3d 183, 206 (Wash. 2000) (Talmadge, J., dissenting) ("Mobile homes are not mobile. The term is a vestige of earlier times when mobile homes were more like today's recreational vehicles. Today mobile homes are designed to be placed permanently on a pad and maintained there for life." (internal quotation marks omitted)).

The Supreme Court has described the typical arrangement between a mobile home's owner and a mobile home park's owner:

> A mobile home owner typically rents a plot of land, called a "pad," from the owner of a mobile home park. The park owner provides private roads within the park, common facilities such as washing machines or a swimming pool, and often utilities. The mobile home owner often invests in site-specific improvements such as a driveway, steps, walkways, porches, or landscaping.

*Yee*, 503 U.S. at 523; *see also Manufactured Hous.*, 13 P.3d at 206 (Talmadge, J., dissenting) ("In most instances a mobile home owner in a park is required to remove the wheels and

anchor the home to the ground in order to facilitate connections with electricity, water and sewerage." (internal quotation marks omitted)).

Given the "site-specific improvements," *Yee*, 503 U.S. at 523, and the fact that "mobile homes are designed to be placed permanently on a pad and maintained there for life," *Manufactured Hous.*, 13 P.3d at 206 (Talmadge, J., dissenting), it is not surprising that the costs of relocating a mobile home are very high. "Once 'planted' and 'plugged in,' [mobile homes] are not easily relocated." *Id.* (internal quotation marks omitted). For example, "[p]hysically moving a double- or triple-wide mobile home involves unsealing; unroofing the roofed-over seams; mechanically separating the sections; disconnecting plumbing and other utilities; removing carports, porches, and similar fixtures; and lifting the home off its foundation or supports." *Id.* (internal quotation marks omitted).

Because they cost less than traditional homes (less even than rental housing in some circumstances), manufactured homes are an attractive option for lower-income and poorer residents. "Mobile home residents are typically poorer than the average rental household, with incomes lower by one-third." *Id.* at 207 (internal quotation marks omitted).

The combination of those factors—the "immobility of mobile homes," *id.* at 206, the resulting high costs of relocation, the fact that mobile home owners typically do not own their pads, and the limited financial resources of many owners of mobile homes—has led to a well-documented problem when the owner of a mobile home park wants to convert the property to a different use:

> The effects on mobile home owners . . . faced with moving because mobile home park owners . . . want to convert a mobile home park to another use can be devastating. A home owner owns the mobile home,

but only rents the land on which it sits. Closure and conversion of a mobile home park force the owner either to move, or to abandon what may be his most valuable equity investment, a mobile home, to the developer's bulldozer. Displacement from a mobile home park can mean economic ruin for a mobile home owner.

. . . .

. . . [Moreover,] there is a major shortage of space for mobile homes. Thus the owner who needs to rent a lot for his mobile home has no choice but to enter the "park owner's market" in which the demand for space far exceeds the supply of available lots.

*Id.* at 206-07 (citations and internal quotation marks omitted).

As a result, many states and municipalities have enacted laws aimed at protecting owners of manufactured homes. Those actions, though, often impinge on the property rights of the owners of mobile home parks, sometimes to such a degree that the legislation amounts to a constitutional violation.

In the state of Washington, an average of 5.8 mobile home parks closed every year between 1989 and 2002. That average rose to 14 park closures per year between 2003 and 2008. The number of closures is not surprising, given the high level of residential development during those years. As some of the Plaintiffs here candidly admit, one investment strategy for mobile home parks is to purchase land located in the path of development. The rental income from the mobile home pads provides steady income and, if the land's value rises as development surrounds the park, the park's owner can sell the land or convert it to other, more profitable uses, such as multi-family housing.

The Washington legislature responded to the large number of park closures by enacting, first, the Mobile Home Reloca-

tion Assistance Act, Wash. Rev. Code § 59.21, 1989 Wash. Sess. Laws, ch. 201. "When a mobile home park is closed, this law requires the park owner to contribute money toward the tenants' relocation costs." *Guimont v. Clarke*, 854 P.2d 1, 3 (Wash. 1993). The Washington Supreme Court held that "the Act is unduly oppressive and violates substantive due process." *Id.* at 16. The court invalidated the law in its entirety. *Id.* at 16-17.

Next, the Washington legislature enacted a law that "gives mobile home park tenants a right of first refusal when the park owner decides to sell a mobile home park." *Manufactured Hous.*, 13 P.3d at 185 (citing Wash. Rev. Code § 59.23.025 (2000)). The Washington Supreme Court invalidated that law, too, this time holding that "the statutory grant of a right of first refusal to tenants of mobile home parks[ ] amounts to a taking and transfer of private property." *Id.* at 196. Although some protections for owners of mobile homes remain on the books in Washington, they are mostly procedural, such as the requirement that, before closure of a mobile home park, the park's owner must give at least 12 months' notice to all residents of the park. Wash. Rev. Code § 59.21.030.

B.  *Tumwater's Ordinances*

Tumwater contains ten manufactured home parks. The parks are located throughout Tumwater, and none appears to border any other park. Three of the parks are very small and do not have a name apart from their respective addresses. The remaining seven are named Laurel Park, Tumwater Mobile Estates, Velkommen, Eagles Landing, Western Plaza, Thunderbird Villa, and Allimor Carriage Estates.

Against the backdrop of increasing closures of manufactured home parks in Washington and the limited constitutionally valid statutory protections, the Tumwater City Council began hearing concerns from residents that some of the own-

ers of Tumwater manufactured home parks had plans to close. Tumwater residents expressed their views at several public meetings. Mobile home owners tended to seek protection from park closures, while park owners tended to emphasize respect for private property and the legal limits on property restrictions.

The City Council ultimately enacted two ordinances. Ordinance No. O2008-027 amended the Tumwater Comprehensive Plan and the Tumwater Zoning Map. Ordinance No. O2008-009 amended the Tumwater City Code. The ordinances create a new Manufactured Home Park land use designation ("MHP") and a new Manufactured Home Park zone district.

The ordinances designate six of the ten existing Manufactured Home Parks—Laurel Park, Tumwater Mobile Estates, Velkommen, Eagles Landing, Western Plaza, and Thunderbird Villa—under the new land use designation and include those properties, and only those properties, as the new Manufactured Home Park zone district. Before the enactment of the ordinances, the zoning code permitted a wide range of uses on the properties, including multi-family residences and other dense types of development. The ordinances restrict those uses in the following relevant ways.

First, the ordinances specify certain "permitted uses," which are allowed as of right: manufactured home parks, one single-family dwelling per lot, parks, trails, open spaces, other recreational uses, family child care homes, and child mini-day care centers. Second, the ordinances specify 11 "conditional uses," which are allowed via a discretionary conditional use permit: churches, wireless communication facilities, cemeteries, child day care centers, schools, neighborhood community centers, neighborhood-oriented commercial centers, emergency communications towers, group foster homes, agriculture, and bed and breakfast establishments. Third, the ordinances permit still other uses if specified criteria are met:

"The City Council may approve the property owner's request for a use exception if the property owner demonstrates a. they do not have reasonable use of their property under the MHP zoning; or b. the uses authorized by the MHP zoning are not economically viable at the property's location."

The stated "intent" of the ordinances is: "The Manufactured Home Park (MHP) zone district is established to promote residential development that is high density, single family in character and developed to offer a choice in land tenancy. The MHP zone is intended to provide sufficient land for manufactured homes in manufactured home parks."

The ordinances include many explanations for the creation of the new land use designation and zone district and the inclusion of existing manufactured home parks in the district. Most relevant here, the ordinances state that applying the new designation and zone district to existing manufactured home parks is consistent with a wide range of goals and policies included in various documents, such as the Tumwater Comprehensive Plan. They also state that:

- "applying the Manufactured Home Park land use designation and zone district to existing manufactured/mobile home parks will help to ensure a sufficient supply of land for these types of uses in the future"

- "manufactured home parks are a source of affordable single family and senior housing in Tumwater," and "protecting manufactured home parks from the pressures of development will help to maintain the existing stock of manufactured housing provided by these 'parks.' "

- "the manufactured/mobile home parks known as Eagles Landing, Laural [sic] Park, Tumwater Mobile Estates, Thunderbird Villa, Velkommen,

and Western Plaza are located within residential neighborhoods and currently have residential zoning and are easily recognized as traditional manufactured housing communities."

- "applying the Manufactured Home Park zone to the six traditional mobile/manufactured home parks . . . is consistent with [a stated policy] to support healthy residential neighborhoods which continue to reflect a high degree of pride in ownership or residency" and "is consistent with [a stated policy] to support the stability of established residential neighborhoods"

The ordinances exclude the three small, unnamed parks, in part because "the small size of these three 'parks' does not foster a sense of community or neighborhood, and the owners of these three small 'parks' appear to own all of the dwellings located on the properties which contrasts sharply with the rest of the more traditional mobile/manufactured home parks in Tumwater where the majority of dwellings are not owned by the land owner." The ordinances excluded the seventh named park—Allimor Carriage Estates ("Allimor")—because it "is currently the only mobile/manufactured home park within Tumwater that is zoned General Commercial, the only 'park' that is almost completely surrounded by General Commercial zoning, and the only 'park' that abuts intensive commercial development in the form of commercial strip development and intensive large scale commercial retail including Albertsons, Costco, and Fred Meyer."

## C.  *Procedural History*

The owners of three of the six newly designated Manufactured Home Parks—Laurel Park, Tumwater Estates, and Velkommen—along with the nonprofit Manufactured Housing Communities of Washington, filed this action in federal

district court.[1] Plaintiffs allege that the enactment of the ordinances violated their constitutional rights under several theories. The district court granted summary judgment to Defendant on all claims and entered final judgment. Plaintiffs timely appeal.

## DISCUSSION

Although Plaintiffs raised a number of theories before the district court, they have limited their appeal to three claims: (1) a federal takings claim, (2) a state takings claim, and (3) a state substantive due process claim.[2]

### A.   Federal Takings Claim

The Fifth Amendment provides, "nor shall private property be taken for public use, without just compensation." There are two types of "per se" takings: (1) permanent physical invasion of the property, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 426 (1982); and (2) a deprivation of all economically beneficial use of the property, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1015-16 (1992). Plaintiffs do not contend that the ordinances constitute a "per se" taking. They argue, instead, that the ordinances constitute a regulatory taking because the ordinances go "too far." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).

---

[1]Plaintiffs also filed a petition for review with the state administrative agency, alleging certain state-law violations. The agency found that Defendant had violated certain state-law provisions but declined to reach, for lack of jurisdiction, the constitutional issues. Those administrative proceedings are not part of this appeal.

[2]Plaintiffs also argue that the district court abused its discretion by granting a motion to quash certain notices of deposition filed by Plaintiffs. *See Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 813 (9th Cir. 2003) (holding that we review for abuse of discretion a district court's decision on a motion to quash). We hold that the district court did not abuse its discretion. The evidence sought is either known to Plaintiffs or is irrelevant to the facial challenges.

**[1]** As a general rule, zoning laws do not constitute a taking, even though they affect real property interests: "[T]his Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests. Zoning laws are, of course, the classic example, which have been viewed as permissible governmental action even when prohibiting the most beneficial use of the property." *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 125 (1978) (citations omitted); *see Pa. Coal*, 260 U.S. at 413 ("Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."); *see also Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (holding that, in considering a regulatory taking case, "we must remain cognizant that 'government regulation—by definition—involves the adjustment of rights for the public good' " (quoting *Andrus v. Allard*, 444 U.S. 51, 65 (1979)).

**[2]** Nevertheless, as noted, regulations that go "too far" constitute a taking. Determining whether a regulation goes too far requires a court to engage in "essentially ad hoc, factual inquiries." *Penn Cent.*, 438 U.S. at 124. "[R]egulatory takings challenges are governed by the standards set forth in [*Penn Central*]." *Lingle*, 544 U.S. at 538. "Primary among [the relevant] factors are [1] the economic impact of the regulation on the claimant and, particularly, [2] the extent to which the regulation has interfered with distinct investment-backed expectations. In addition, [3] the character of the governmental action . . . may be relevant in discerning whether a taking has occurred." *Id.* at 538-39 (citation, internal quotation marks, and brackets omitted). "[T]hese three inquiries . . . share a common touchstone. Each aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Id.* at 539.

At the outset, we note that Plaintiffs bring a *facial* challenge. It is not clear that a facial challenge can be made under

*Penn Central. Guggenheim v. City of Goleta*, 638 F.3d 1111, 1118 & n.32 (9th Cir. 2010) (en banc), *cert. denied*, 131 S. Ct. 2455 (2011). As we did in *Guggenheim*, we will "assume, without deciding, that a facial challenge can be made under *Penn Central*." *Id.* at 1118. We turn, then, to the three *Penn Central* factors.

1.    *"Economic Impact of the Regulation on the Claimant"*

**[3]** Plaintiffs offer very little evidence of economic effect resulting from enactment of the ordinances. At best, Plaintiffs have presented information that reflects an economic loss of less than 15% with respect to one of the three Plaintiff properties and *no effect* on the other two Plaintiff properties or the properties of the remaining affected MHP parks.[3] Although there is no precise minimum threshold, Plaintiffs' evidence is of very little persuasive value in the context of a federal takings challenge. *See, e.g.*, *Cienega Gardens v. United States*, 331 F.3d 1319, 1343 (Fed. Cir. 2003) (holding that a taking occurred when a regulation effected a 96% loss of return on equity). A small decrease in value, for only one affected property, falls comfortably within the range of permissible land-use regulations that fall far short of a constitutional taking. *See Penn Cent.*, 438 U.S. at 125 ("[T]his Court has upheld land-use regulations that destroyed or adversely affected recognized real property interests."). The Supreme Court cases "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking,' see *Euclid v.*

---

[3]The one Plaintiff property that showed a decrease in value was Velkommen. Various reports and assessments—operating under different background assumptions—valued the park: One report assigned a pre-ordinance value of $2.7M and a post-ordinance value of $2.4M (11.1% decrease); one assessment assigned a pre-ordinance value of $1.8M and a post-ordinance value of $1.6M (11.1% decrease); and a final report assigned a pre-ordinance value of $1.675M and a post-ordinance value of $1.45M (13.4% decrease). The other two Plaintiff properties showed no change pre-ordinance and post-ordinance (with appraised values of $6.3M and $4.37M, respectively).

*Ambler Realty Co.*, 272 U.S. 365 (1926) (75% diminution in value caused by zoning law); *Hadacheck v. Sebastian*, 239 U.S. 394 (1915) (87 1/2% diminution in value)." *Penn Central*, 438 U.S. at 131.

**[4]** In sum, the minimal economic effect of the ordinances does not support a takings claim.

2.  *"Distinct Investment-backed Expectations"*

**[5]** When Plaintiffs bought the properties, they had the expectation that, when they desired or when market conditions made it attractive, they could convert to a more profitable use, such as multi-family housing or housing developments. The zoning laws previously allowed such development, and the ordinances now foreclose that option (at least until Plaintiffs show that there are no economically viable options available under the other uses expressly permitted by the ordinances). But those facts are no different than the assertions that could be made by property owners adversely affected by any zoning law. As the Supreme Court wrote in *Penn Central*, "the submission that [the plaintiffs] may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development is quite simply untenable. Were this the rule, this Court would have erred [in many of its previous takings cases]." *Id.* at 130. Of most importance, Plaintiffs retain the ability to continue operating the properties as manufactured home parks. "So the law does not interfere with what must be regarded as [Plaintiffs'] primary expectation concerning the use of the parcel." *Id.* at 136. In other words, although the ordinances affected one of Plaintiffs' expectations—that at some indefinite time in the future they could convert their properties to some other specific uses —the ordinances did not affect Plaintiffs' "primary expectation."

In *Guggenheim*, we held that " '[d]istinct investment-backed expectations' implies reasonable probability, like

expecting rent to be paid, not starry eyed hope of winning the jackpot if the law changes." 638 F.3d at 1120. In our view, the ordinances at issue here fall between the two poles used in that example. Plaintiffs' expectation of converting their properties is speculative to a degree, because it depends on future events (chief among them, market forces making conversion economically attractive). But it is not as speculative as "winning the jackpot if the law changes," because it depends only on unknown future economic trends, not an outright change in law. Our clarification later in the same paragraph provides a means of assessing Plaintiffs' expectations here: "Speculative possibilities of windfalls do not amount to 'distinct investment-backed expectations,' unless they are shown to be probable enough materially to affect the price." *Id.* at 1120-21. As discussed above, the speculative possibility of converting the properties to another use had *little to no effect* on price.

**[6]** This factor, too, fails to support a takings claim.

3.   *"The Character of the Governmental Action"*

"[T]he character of the governmental action—for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good—may be relevant in discerning whether a taking has occurred." *Lingle*, 544 U.S. at 539 (internal quotation marks omitted). The government generally cannot " 'forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' " *Id.* at 537 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).

**[7]** Although it is a close call, we agree with Plaintiffs that the character of the governmental action here slightly favors their takings claim. The intent and effect of the ordinances are to require only Plaintiffs and the other affected owners of

manufactured home parks to continue to provide the public benefit (manufactured home parks), when the benefit could be distributed more widely (for example, by providing relocation assistance to owners of manufactured homes or a larger MHP zone district). The ordinances do allow many other uses but, at least at the moment, those other uses do not appear to provide truly economically attractive alternatives to the existing manufactured home parks. As a practical matter, Plaintiffs must continue to use their properties as manufactured home parks. Indeed, that was the intended effect of the ordinances.

**[8]** That analysis goes only so far, however. Unlike in other cases where the challenged law *required* continued operation of an existing use, *e.g.*, *Cienega Gardens*, 331 F.3d at 1338-39, the ordinances here do not *force* Plaintiffs to continue operating their properties as manufactured home parks. *See Lingle*, 544 U.S. at 537 (holding that the government cannot "forc[e] some people alone to bear public burdens"). As just a few examples, Plaintiffs could decide to close their parks, to convert their properties to other allowed uses, or to sell the properties, and the ordinances have no effect on those possibilities.

### 4.  *Conclusion*

**[9]** Because the first two factors weigh strongly against a takings claim and the third factor weighs only slightly in favor of a takings claim, we conclude that, on their face, the ordinances do not constitute a taking under the Fifth and Fourteenth Amendments. *See also Guggenheim*, 638 F.3d at 1120 (holding that the first two factors are the "primary" factors to consider; the character of the governmental action is not on equal footing).

### B.  *State Takings Claim*

Plaintiffs next argue that, even if the ordinances do not constitute a taking under the Federal Constitution, the ordinances

nevertheless effect a taking under the state constitution.[4] Article I, section 16 of the Washington Constitution provides, in relevant part: "No private property shall be taken or damaged for public or private use without just compensation having been first made . . . ."

Commentators have asserted that the Washington Supreme Court cases that interpret that provision are confusing and that discerning the applicable analytical framework is difficult. Roger D. Wynne, *The Path Out of Washington's Takings Quagmire: The Case for Adopting the Federal Takings Analysis*, 86 Wash. L. Rev. 125 (2011); Jill M. Teutsch, Comment, *Taking Issue with Takings: Has the Washington State Supreme Court Gone Too Far?*, 66 Wash. L. Rev. 545 (1991); Richard L. Settle, *Regulatory Taking Doctrine in Washington: Now You See It, Now You Don't*, 12 U. Puget Sound L. Rev. 339 (1989); *see also Guimont v. City of Seattle*, 896 P.2d 70, 75-76 (Wash. Ct. App. 1995) (describing the doctrine as "the complex, confusing and often-ethereal realm of theoretical law that has developed in Washington under the taking clause"). Quagmire or not, we need not wade far into this area of Washington law, because Plaintiffs advance only two specific arguments—both leaning heavily on the Washington Supreme Court's decision in *Manufactured Housing*—concerning state takings law. We turn to that case.

**[10]** In *Manufactured Housing*, 13 P.3d at 185, the Washington Supreme Court considered the constitutionality of a state law that "g[ave] qualified tenants a right of first refusal to purchase a mobile home park."[5] The court held that "a right

---

[4]The district court did not analyze this issue. Because this is a pure issue of law that the parties have briefed fully, we decide it on the merits. *Bibeau v. Pac. Nw. Research Found. Inc.*, 188 F.3d 1105, 1111 n.5 (9th Cir. 1999).

[5]The court described the act as follows:

> To exercise a right of first refusal, the tenants must organize into a "qualified tenant organization" and give the park owner

of first refusal, even one created by statute, can create an interest in property." *Id.* at 192. The court reasoned that "[a] right of first refusal to purchase is a valuable prerogative, limiting the owner's right to freely dispose of his property by compelling him to offer it first to the party who has the first right to buy." *Id.* (internal quotation marks omitted). Citing a treatise, the court concluded that "the right to grant first refusal is a part of 'the bundle of sticks' which the *owner* enjoys as a vested incident of ownership." *Id.* at 193 (footnote omitted). "Property is not one single right, but is composed of several distinct rights, which each may be subject to regulation. The right of property includes four particulars: (1) right of occupation; (2) right of excluding others; (3) right of disposition, or the right of transfer in the integral right to other persons; (4) right of transmission." *Id.* (internal quotation marks and brackets omitted). Accordingly, "the statute deprives park owners of a fundamental attribute of ownership." *Id.* at 194; *see also id.* ("The instant case falls within the rule that would generally find a taking where a regulation deprives the owner of a fundamental attribute of property ownership.").

---

written notice of "a present and continuing desire to purchase the mobile home park." Once the park owner has received such notice, the park owner must notify the tenants of any agreement to sell the park to a third party, as well as disclose the agreement's terms. If the park owner fails to properly notify the qualified tenant organization, a pending third party sale is voidable.

Upon receiving proper notice, the tenants have 30 days in which to pay the park owner two percent of the third party's agreed purchase price and to tender a purchase and sale agreement as financially favorable as the agreement between the owner and the third party. If the tenants meet these requirements within the 30-day period, the park owner must sell them the park. If, however, the tenants fail to meet these requirements or if, in the case of seller financing, the owner determines selling the park to the tenants would create a greater financial risk than selling to the third party, the owner may proceed with the sale to the third party.

*Manufactured Hous.*, 13 P.3d at 185 (citations and footnotes omitted).

**[11]** The court held, additionally, that "we are persuaded that a taking has occurred in this case not only because an owner is deprived of a fundamental attribute of ownership, but also because this property right is statutorily *transferred*" to the park residents, who can exercise the right of first refusal. *Id.* "[T]he actual effect of [the statute] is more closely akin to the exercise of eminent domain . . . because the property right is not only taken, but it is statutorily transferred to a private party for an alleged public use." *Id.*

**[12]** Plaintiffs first argue that the ordinances have destroyed one of the sticks in the bundle representing a fundamental property right, by depriving the parks' owners of the right to dispose of their property as they choose and effectively conferring control of that right on the tenants. We disagree. As an initial matter, the ordinances here do not at all limit the owners' ability freely to *dispose* of the property. Indeed, one owner appears to have sold his property.

**[13]** The ordinances restrict to some extent the owners' ability to *use* their properties, because they can no longer build multi-family housing, for example. But imposing *use* restrictions on property—as distinct from restrictions on alienation—is the essence of zoning. The Washington Supreme Court consistently has defined the fundamental attributes of property rights by reference to rights that do *not* include the free use of the property. *See id.* at 193 (identifying the fundamental rights of occupation, excluding others, disposition, and transmission); *see also Guimont*, 854 P.2d at 10 ("[T]he court must first ask whether the regulation destroys or derogates any fundamental attribute of property ownership: including the right to possess; to exclude others; or to dispose of property."); *Presbytery of Seattle v. King County*, 787 P.2d 907, 912 (Wash. 1990) ("[T]he court should ask whether the regulation destroys one or more of the fundamental attributes of ownership—the right to possess, to exclude others and to dispose of property."). Indeed, concerning *use*, the court has defined a fundamental attribute of property only with respect

to being able to make *some economically viable use* of the property. *See, e.g.*, *Guimont*, 854 P.2d at 10 ("[A]nother 'fundamental attribute of property' appears to be the right to make *some* economically viable use of the property."). Plaintiffs do not argue, of course, that the ordinances deprive them of all economically viable uses; they are instead being encouraged to continue the economically viable use that they freely chose. In sum, the ordinances do not destroy or limit any fundamental property right as defined by the Washington Supreme Court.

Plaintiffs' other argument is that a taking has occurred because some property right has been transferred to the parks' residents. As an initial matter, it is unclear whether this alternative argument is viable. The court's discussion of the statutory transfer issue in *Manufactured Housing* appears to be premised on its finding of a fundamental property right: "[W]e are persuaded that a taking has occurred in this case not only because an owner is deprived of a *fundamental* attribute of ownership, but also because *this* property right is statutorily *transferred*." 13 P.3d at 194 (first emphasis added). In any event, Plaintiffs' argument fails on its own terms.

In *Manufactured Housing*, the statute granted the right of first refusal *to the parks' residents*. Accordingly, the residents —and only the residents—could exercise that valuable property right. Here, the residents have no ability—now or in the future—to require the parks' owners to perform any act. Nothing prohibits the owners from converting their properties to one of the many permitted uses under the ordinances (such as a cemetery, bed and breakfast, day care center, recreational facility, or single-family dwelling) or from selling to a third party. If a park owner so chose, the residents would be powerless to affect that decision.

**[14]** We therefore hold that the ordinances do not constitute a taking under the Washington Constitution.

C.   *State Substantive Due Process Claim*

**[15]** Finally, Plaintiffs argue that the ordinances violate their state substantive due process rights. Article I, section 3 of the Washington Constitution states: "No person shall be deprived of life, liberty, or property, without due process of law."

> To determine whether the regulation violates due process, the court should engage in the classic 3-prong due process test and ask: (1) whether the regulation is aimed at achieving a legitimate public purpose; (2) whether it uses means that are reasonably necessary to achieve that purpose; and (3) whether it is unduly oppressive on the land owner. In other words, 1) there must be a public problem or "evil," 2) the regulation must tend to solve this problem, and 3) the regulation must not be unduly oppressive upon the person regulated. The third inquiry will usually be the difficult and determinative one.

*Presbytery*, 787 P.2d at 913 (footnotes and some internal quotation marks omitted).

The first prong is "whether the regulation is aimed at achieving a legitimate public purpose." *Id.* The stated "intent" of the ordinances is: "The Manufactured Home Park zone district is established to promote residential development that is high density, single family in character and developed to offer a choice in land tenancy. The MHP zone is intended to provide sufficient land for manufactured homes in manufactured home parks." That stated purpose is quintessentially legitimate: the organization of land uses to promote the public goals of "high density, single family" development and a "choice in land tenancy." This prong is easily met. *See, e.g.*, *Guimont*, 854 P.2d at 14 (concluding, with little discussion, that "aid[ing] mobile home owners with relocation expenses

when a mobile home park is closed" is a legitimate public purpose).

The second prong is "whether [the law] uses means that are reasonably necessary to achieve that purpose." *Presbytery*, 787 P.2d at 913. In *Guimont*, the Washington Supreme Court held:

> Certainly, providing mobile home owners with relocation assistance would be a reasonably necessary step in achieving the Act's purpose. The more difficult issue here is whether it is reasonably necessary to require the assistance to be paid by the closing park owner. To assist in determining whether these means used by the Act are reasonably necessary in all regards, we must turn to the third due process question, that of undue oppression.

854 P.2d at 14.

**[16]** A similar analysis applies here. The zoning changes encourage the continued provision of manufactured home parks, which is "[c]ertainly" a reasonably necessary step in achieving the ordinances' purpose. "The more difficult issue here is whether it is reasonably necessary to require" that development to be provided only by some of the present-day park owners. *Id.* Plaintiffs have a point that the provision of certain types of housing may be considered a burden that should be borne more generally by the public. As in *Guimont*, the answer to the reasonableness of the law depends on "the third due process question, that of undue oppression." *Id.*; *see also Presbytery*, 787 P.2d at 913 ("The third inquiry will usually be the difficult and determinative one.").

> We determine if a statute is unduly oppressive by examining a number of nonexclusive factors to weigh the fairness of the burden being placed on the property owner:

> On the public's side, the seriousness of the public problem, the extent to which the owner's land contributes to it, the degree to which the proposed regulation solves it and the feasibility of less oppressive solutions would all be relevant. On the owner's side, the amount and percentage of value loss, the extent of remaining uses, past, present and future uses, temporary or permanent nature of the regulation, the extent to which the owner should have anticipated such regulation and how feasible it is for the owner to alter present or currently planned uses.

*Guimont*, 854 P.2d at 14-15 (internal quotation marks omitted).

**[17]** Here, we conclude that the two most important factors are the fact that the present-day effect on Plaintiffs' property values is little to none and the fact that Plaintiffs may continue to use their properties as they have been used for decades. It is true that Tumwater's solution is not necessarily the most efficient and that it concentrates the economic burden on a relatively small number of property owners. It is also true that the regulation is permanent (at least until future speculative amendments). But, when all is said and done, the amount of harm is very small or nonexistent. In each case described by Plaintiffs in which the Washington Supreme Court has found a due process violation, the amount of measurable harm has been great. *See Guimont*, 854 P.2d at 15-16 (concluding that the relocation-assistance statute violated substantive due process because it imposed a fee of $7,500 per pad on a park owner who wished to close, which would amount to $750,000 for a park with 100 pads); *Sintra, Inc. v. City of Seattle*, 829 P.2d 765, 776-77 (Wash. 1992) (holding that imposition of a $218,000 fee to develop a $670,000 property was unduly oppressive).

**[18]** In this regard, we consider it important that Plaintiffs have chosen to raise a *facial* challenge. If a particular Plaintiff

could show a significant diminution in value of a particular parcel of property, then the weighing of the factors might be different. As it stands, however, the fact that Plaintiffs have presented no evidence of diminution of value, apart from one park that suffered a loss in value of less than 15%, severely undermines their claim that, *on their face*, the ordinances are unduly oppressive. It would be odd to conclude that an ordinance that had no economic effect on most properties was oppressive at all, let alone unduly oppressive. For those reasons, we hold that the ordinances do not violate Washington principles of substantive due process.

Under the heading of substantive due process, Plaintiffs also argue that the ordinance is illegal "spot zoning": "that an individual piece of property was singled out for zoning incompatible with neighboring property." *Buckles v. King County*, 191 F.3d 1127, 1137 (9th Cir. 1999).[6] As an initial matter, it is unclear whether a party can raise a "spot zoning" challenge in the context of a facial challenge to ordinances; we have found no Washington cases that involve a *facial* "spot zoning" challenge. We assume, without deciding, that a facial "spot zoning" challenge is viable.

[19] "Spot zoning has been consistently defined to be zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from and inconsistent with the classification of surrounding land, and not in accordance with the comprehensive plan." *Save Our Rural Env't v. Snohomish County*, 662 P.2d 816, 819 (Wash. 1983). There is no "hard and fast rule that all spot zoning is illegal." *Id.* "[T]he main inquiry of the court is whether the zoning action bears a substantial rela-

---

[6]"Spot zoning" "is variously characterized as a substantive due process violation, a taking, or even an equal protection violation; spot zoning does not neatly fit into one category." *Buckles*, 191 F.3d at 1137. In the absence of any objection, we accept, for purposes of analysis, Plaintiffs' characterization of their spot zoning claim.

tionship to the general welfare of the affected community." *Id.* For all the reasons discussed above, there is little doubt that the ordinances bear a substantial relationship to the general welfare of the community. Other than the original Washington "spot zoning" decision in 1969, *Smith v. Skagit County*, 453 P.2d 832 (Wash. 1969), in which the court held that placing an aluminum processing plant on an island constituted illegal spot zoning, Plaintiffs cite no case in which the Washington courts have found illegal spot zoning. *See Save Our Rural Env't*, 662 P.2d at 819 (holding that no illegal spot zoning occurred where a new "business park zoning classification provides a flexible means to broaden the industrial base of the region and to produce energy and travel time savings for employees"); *Bassani v. Bd. of Cnty. Comm'rs*, 853 P.2d 945, 951 (Wash. Ct. App. 1993) (holding that there was no illegal spot zoning where the zoning was "generally consistent" with the relevant plans and was "good for the county, and good for one of the county's major employers"). We thus reject Plaintiffs' spot zoning challenge.

## CONCLUSION

Plaintiffs cannot establish that the Tumwater ordinances, on their face, effect a taking or constitute undue oppression. The most fundamental reason why that is so is that the enactment of the ordinances had nearly no effect on the value of their properties. They can continue to use the properties just as they have chosen to do for years; the new zoning ordinances allow many alternative uses; and the new zoning ordinances contain a "safety valve" pursuant to which Plaintiffs may pursue other uses if the presently authorized uses are not economically viable.

**AFFIRMED.**