**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BRIDGE AINA LEʻA, LLC,<br>*Plaintiff-Appellant/Cross-Appellee*,<br><br>v.<br><br>STATE OF HAWAII LAND USE COMMISSION; VLADIMIR P. DEVENS, in his individual and official capacity; KYLE CHOCK, in his individual and official capacity; NORMAND ROBERT LEZY, in his individual and official capacity; DUANE KANUHA, in his official capacity; CHARLES JENCKS, in his official capacity; LISA M. JUDGE, in her individual and official capacity; NICHOLAS W. TEVES, JR., in his individual and official capacity; RONALD I. HELLER, in his individual and official capacity,<br>*Defendants-Appellees/Cross-Appellants.* | Nos. 18-15738<br>18-15817<br><br>D.C. No.<br>1:11-cv-00414-<br>SOM-KJM<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Hawaii
Susan O. Mollway, District Judge, Presiding

Argued and Submitted October 21, 2019
Honolulu, Hawaii

Filed February 19, 2020

Before:  SUSAN P. GRABER, MILAN D. SMITH, JR.,
and PAUL J. WATFORD, Circuit Judges.

Opinion by Judge Milan D. Smith, Jr.

## SUMMARY[*]

### Civil Rights/Takings

The panel affirmed the district court's dismissal of plaintiff's equal protection claim, reversed the denial of defendant's motion for judgment as a matter of law, vacated a judgment entered for plaintiff following a jury verdict, and remanded with instructions to enter judgment for defendant, in an action arising from the State of Hawaii's Land Use Commission's 2011 reversion of 1,060 acres on the island of Hawaii from a conditional urban land use classification to the prior agricultural use classification.

The Commission's reversion followed some twenty-two years during which various landowners made unfulfilled development representations to the Commission to obtain and maintain the land's urban use classification. Plaintiff Bridge Aina Le'a, LLC, one of the landowners at the time of the reversion, challenged the reversion's legality and constitutionality in a state agency appeal, and in this case Following trial, a jury made dual findings that there was a regulatory unconstitutional taking of plaintiff's property

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

pursuant to both *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). The district court determined that either finding independently supported the verdict; denied, in part, the State's motion for judgment as a matter of law (JMOL); entered judgment for plaintiff; and awarded $1 in nominal damages. Following entry of judgment, the district court denied the State's renewed JMOL motion.

The panel held that the district court erred in denying the State's renewed JMOL motion because plaintiff's evidence did not establish a taking pursuant to either *Lucas* or *Penn Central.* The panel held that there was no taking pursuant to *Lucas* because the land retained substantial residual value in its agricultural use classification and this classification still allowed plaintiff to use the land in economically beneficial ways. Accordingly, the panel concluded that the State was entitled to judgment as a matter of law on plaintiff's *Lucas* theory, and turned to the *Penn Central* analysis.

Applying the *Penn Central* factors to the trial evidence, the panel concluded that the jury could not reasonably find for plaintiff. The panel first determined that the valuation evidence, properly understood, weighed strongly against a taking pursuant to the first *Penn Central* factor. The panel rejected plaintiff's assertion that the disruption of a land sales agreement showed economic impact, noting that the record showed that plaintiff overstated the reversion's impact on its contractual relationship with the potential purchaser. The panel held that the Commission's reversion order did not interfere with plaintiff's reasonable investment-backed expectations at the time of acquisition. The panel noted that the Commission had made clear in 1991, before plaintiff purchased the property, that it might

issue an order to show cause as to why the land should not revert for failure to substantially comply with representations made to obtain reclassification. Hawaii law expressly authorized the Commission to impose this condition, and such conditions ran with title to the land. The panel further noted that plaintiff had expressly committed to build 385 affordable housing units as a part of an amendment to the order governing the land's conditional urban use classification and had failed to complete the units.

The panel next considered the character of the reversion order and held that the concentrated effect of the reversion was reflective of the confines of a generally applicable Hawaii law land use reclassification procedure. The panel further held that the Hawaii Supreme Court's invalidation of the reversion as a matter of Hawaii statutory procedural requirements did not carry the constitutional significance that either plaintiff or the district court ascribed to it.

The panel concluded that because plaintiff's own evidence established a diminution in value that was proportionately too small and because the reversion did not interfere with plaintiff's reasonable investment-backed expectations for the land, no reasonable jury could conclude that the reversion effected a taking pursuant to the *Penn Central* analysis. The panel held that its analysis of plaintiff's taking theories required it to reverse the district court's denial of the State's renewed JMOL motion. The panel further vacated the judgment for plaintiff and the nominal damages award, and remanded with instructions for the district court to enter judgment for the State.

Addressing the dismissal of plaintiff's equal protection claim, the panel held that the claim was barred by the Hawaii Supreme Court's decision in plaintiff's agency appeal. Thus, applying Hawaii law, the panel could find no material

difference between the equal protection issue plaintiff raised in the agency appeal and the one raised in this suit.  The panel further rejected plaintiff's contention that the Hawaii Supreme Court's remand for further proceedings consistent with its opinion rendered the judgment nonfinal.  The panel noted that the Hawaii Supreme Court expressly vacated the Hawaii circuit court's judgment on the issue of equal protection and remanded for the circuit court to effectuate that vacatur.  That remand could not have resulted in a different resolution of plaintiff's equal protection challenge because no issue of law or fact regarding that challenge remained unresolved.  Finally, the panel held that plaintiff received a full and fair opportunity to raise the equal protection challenge in the agency appeal.

## COUNSEL

Bruce D. Voss (argued), Matthew C. Shannon, and John D. Ferry III, Bays Lung Rose & Holma, Honolulu, Hawaii, for Plaintiff-Appellant/Cross-Appellee.

Ewan C. Rayner (argued), Deputy Solicitor General; David D. Day, Deputy Attorney General; William J. Wynhoff, Supervising Deputy Attorney General; Clyde J. Wadsworth, Solicitor General; Department of the Attorney General, Honolulu, Hawaii; for Defendants-Appellees/Cross-Appellants.

**OPINION**

M. SMITH, Circuit Judge:

This case stems from the reversion of the land use classification of 1,060 acres of largely vacant and barren, rocky lava flow land in South Kohala, on the island of Hawaii. In 2011, Defendant-Appellee and Cross-Appellant the State of Hawaii Land Use Commission (the Commission) ordered the land's reversion from its conditional urban use classification to its prior agricultural use classification. This reversion followed some twenty-two years during which various landowners made unfulfilled development representations to the Commission to obtain and maintain the land's urban use classification. Plaintiff-Appellant and Cross-Appellee Bridge Aina Leʻa, LLC (Bridge), one of the landowners at the time of the reversion, challenged the reversion's legality and constitutionality in a state agency appeal, and in this case.

The cross-appeals here come to us following a final judgment in a jury trial with a verdict for Bridge and the district court's denial of a post-judgment motion for judgment as a matter of law (JMOL). Although the parties raise several issues, we need decide only two. First, we must decide whether the State[1] was entitled to JMOL on Bridge's

---

[1] We use the term "the State" to refer collectively to the Commission and the commissioners whom Bridge sued in their official capacities. *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity . . . should be treated as suits against the State."). The commissioners whom Bridge named in their official capacities are: Vladimir P. Devens, Kyle Chock, Normand R. Lezy, Lisa M. Judge, Nicholas W. Teves, Jr., Ronald I. Heller, Duane Kanuha, Thomas Contrades, and Charles Jencks. Bridge sued all but the last two commissioners—neither of whom voted for the reversion—in their

claims that the reversion was a regulatory taking in violation of the Fifth Amendment.  After an eight-day jury trial, the jury found that the reversion was such a taking.  The State urges us to reverse on the ground that Bridge's evidence did not establish a taking.  Second, we must decide whether the Hawaii Supreme Court's adjudication of Bridge's equal protection challenge in the state agency appeal barred the same issue Bridge alleged here.  *See DW Aina Leʻa Dev., LLC v. Bridge Aina Leʻa, LLC*, 339 P.3d 685 (Haw. 2014).  Bridge contends that the Hawaii Supreme Court neither decided the same equal protection issue Bridge raised in this lawsuit, nor issued a final judgment on the merits in which Bridge had a full and fair opportunity to litigate the issue.

We reverse the denial of the State's renewed JMOL motion because, as a matter of law, the evidence did not establish an unconstitutional regulatory taking.  We vacate the judgment and remand.  We affirm the district court's dismissal of Bridge's equal protection claim.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  The Reclassification History of the 1,060 Acres

#### A.  The Conditional Urban Reclassification

For over forty years before the reclassification, the 1,060 acres at issue were vacant and part of a larger 3,000 acre-parcel zoned for agricultural use.  This classification generally restricted the landowner to certain statutorily specified uses.  *See* Haw. Rev. Stat. § 205-2(d)(1)–(16) (setting forth the general uses for agricultural land); *see also*

---

individual capacities as well.  Commissioner Contrades died during the pendency of this litigation before the district court.

*id*. § 205-4.5 (elaborating on permissible uses of agricultural land depending on soil ratings). The landowner also could petition to obtain a permit for "certain unusual and reasonable uses." *Id.* § 205-6(a).

In 1987, non-party Signal Puako Corporation (Signal), the then-landowner, decided that it would seek to develop a mixed residential community on the 1,060 acres as the first phase of a development project on the entire 3,000 acres. To do so, Signal petitioned the Commission to reclassify 1,060 acres as urban pursuant to Hawaii's land use reclassification procedure. *See* Haw. Rev. Stat. § 205-4(a). If the land were zoned for urban use, Signal could pursue "activities or uses as provided by ordinances or regulations of the county within which the urban district is situated." *Id.* § 205-2(b).

The Commission approved the petition in a January 1989 order (the 1989 Order). In doing so, the Commission exercised its authority to "modify the petition by imposing conditions necessary . . . to assure substantial compliance with representations made by the petitioner in seeking a boundary change." *Id*. § 205-4(g). In relevant part, Condition One required Signal to make 60% of the proposed 2,760 residential units affordable, for a total of 1,656 affordable housing units. Condition Nine required Signal to develop the land in substantial compliance with representations made to obtain reclassification. The 1989 Order did not specify any deadlines, nor did the order specify any penalties for noncompliance. Nevertheless, the conditions the Commission imposed ran with the title to the land. *Id*.

At some point, non-party Puako Hawaii Properties (Puako), an entity in which Signal was a partner, took title to the 3,000 acres. Puako proposed a mixed residential community which would have fewer total housing units than

Signalʼs proposal and for which construction would end by 1999. Puako therefore petitioned to modify the 1989 Order.

The Commission approved Puakoʼs petition in a July 1991 order (the 1991 Order) with conditions. Like the 1989 Order, the 1991 Order required Puako to make 60% of the residential units affordable housing. But the 1991 Order reduced the required affordable housing units to 1,000 units given the reduction to the proposed developmentʼs total number of units. The 1991 Order again imposed a condition requiring Puako to develop the land in substantial compliance with its representations. This time, the Commission specified that "[f]ailure to so develop the Property may result in reversion of the Property to its former classification or change to a more appropriate classification."[2]

Notwithstanding Puakoʼs representations, the 1,060 acres remained undeveloped by 1999. Bridge acquired the entire 3,000 acres at this time—inclusive of the 1,060 acres

---

[2] This language tracked a 1990 amendment to the Commissionʼs statutory authority to impose reclassification conditions pursuant to Hawaii Revised Statute § 205-4(g). The statute specifies that "[t]he commission may provide by condition that absent substantial commencement of use of the land in accordance with such representations, the commission shall issue and serve upon the party bound by the condition an order to show cause why the property should not revert to its former land use classification or be changed to a more appropriate classification." Haw. Rev. Stat. § 205-4(g); *see also DW Aina Leʻa Dev.*, 339 P.3d at 709 ("This sentence was added to [] § 205-4(g) in 1990. The legislative history indicates that the legislature sought to empower the [Commission] to void a district boundary amendment where the petitioner does not substantially commence use of the land in accordance with representations made to the [Commission]." (citations and emphasis omitted)).

of conditionally reclassified urban land—for $5.2 million plus closing costs under its then-name Bridge Puako, LLC.

## B. The Post-Acquisition Amendments to the Conditions

In September 2005, nearly six years after acquiring the land, Bridge moved to amend the 1991 Order in part. Like the prior landowners, Bridge proposed a mixed residential community. Bridge, however, argued that the cost of complying with the 1991 Order's affordable housing condition was too high. According to Bridge, it would be economically infeasible to develop the property without a lower level of required affordable housing units. Bridge contended that an appropriate benchmark would be the 20% level set by a then-recent County of Hawaii affordable housing ordinance.

The Commission amended the affordable housing condition in a November 2005 order (the 2005 Order). Condition One set the affordable housing unit requirement at 20%, requiring Bridge to build a minimum of 385 units. For the first time, the Commission set a deadline for the condition. Specifically, Bridge had to provide occupancy certificates for all affordable housing units by November 17, 2010. The Commission affirmed all other conditions of the 1989 Order, as amended by the 1991 Order.

Throughout 2006 and 2007, Bridge appeared before the Commission to assure the Commission of its compliance with the conditions, including through the apparent construction of wells, roads, and other infrastructure. According to Bridge, however, further progress "was hampered somewhat" by the requirement that Bridge prepare an environmental impact statement for the project in

accordance with *Sierra Club v. Department of Transportation*, 167 P.3d 292 (Haw. 2007).

## C. The Order to Show Cause (OSC)

As early as September 2008, several commissioners expressed concerns that Bridge's status reports "showed 'no activity' with respect to the conditions imposed by the 1991 decision and order, as amended in 2005." *DW Aina Le‘a Dev*., 339 P.3d at 693.  In December 2008, the Commission ordered Bridge to show cause why the land should not revert to its prior agricultural use classification.  The Commission explained that it had reason to believe that Bridge and its predecessors had failed to satisfy multiple reclassification conditions and had not fulfilled various representations.

The Commission held the first OSC hearing in January 2009.  Notwithstanding the potential impact ongoing OSC proceedings might have on the use of the land, Bridge agreed to sell the 1,060 acres to non-party DW Aina Le‘a Development, LLC (DW).  Pursuant to a February 2009 written agreement, Bridge was to convey the land in three phases in exchange for a total of $40.7 million.[3]  Bridge and DW would enter into a joint agreement, in which Bridge would develop the nearly 2,000 agricultural use acres remaining in its possession.  Bridge would retain the right to plan for the overall 3,000 acres, including the placement of a sewage treatment plant, school, and park on the agricultural land.

---

[3] This agreement replaced the prior 2008 sale agreement between Bridge and non-party Relco Corporation (Relco).  Bridge and Relco amended that agreement before it closed so that Relco could give its interest to DW.  Relco, however, was DW's managing entity.

On April 30, 2009, the Commission reconvened to discuss the OSC.  Bridge represented to the Commission that it was in the process of transferring the 1,060 acres to DW, which would assume the responsibility of constructing the 385 affordable housing units.  The State Office of Planning advocated for reversion, noting that Bridge indicated that it could not complete the 385 affordable housing units by the November 2010 deadline.  Various commissioners expressed dismay at what they viewed as unfulfilled promises made to obtain the reclassification.

At the conclusion of the hearing, the Commission held a voice vote on the OSC (the 2009 Voice Vote), in which seven commissioners voted to revert the zoning of the 1,060 acres to agricultural use.  The Commission never put the result of the vote into a final written order.

After the 2009 Voice Vote, DW did not make any payments due pursuant to the February 2009 sale agreement. Nevertheless, in the month following the vote, DW intervened in the OSC proceedings and advised the Commission that any reversion would make development impossible, including providing the 385 affordable housing units.  DW moved to stay any decision and order pending consideration of additional information, including an overall conceptual plan for the project and an affordable housing unit site plan.  The Commission agreed to stay the proceedings in June 2009.

In August 2009, Bridge and DW co-petitioned the Commission to rescind the OSC, contending that they had performed, or were in the process of performing, all the conditions the OSC cited.  They also contended that the 2009 Voice Vote "put an immediate and substantial cloud over the Project, making it extremely difficult in this economic environment to secure short-term or long-term financing to

develop and complete the Project." Nevertheless, Bridge and DW represented that DW would still pursue completion of the 385 units by November 17, 2010, and that the units "will be provided" if the Commission rescinded the OSC. The Commission rescinded the OSC in September 2009, subject to the single "condition precedent" of requiring the construction of sixteen affordable units by March 31, 2010.

Following the OSC's rescission, Bridge and DW modified their sale agreement in December 2009 to change the timing of purchases but they retained the previously agreed-upon $40.7 million price. DW would buy a 60-acre affordable housing parcel for $5 million, effective December 11, 2009. DW also would pay Bridge "development expenses" of some $1.191 million for that parcel. The final closing date for the remaining 1,000 acres was set for February 28, 2010, by which point DW would have paid Bridge an additional $35.7 million. Consistent with this agreement, DW purchased the 60-acre parcel from Bridge in December 2009.

## D. The Resumption of OSC Proceedings and the Reversion Order

On June 10, 2010, DW informed the Commission that it had completed the sixteen affordable housing units by the March 2010 deadline. In response, the State Office of Planning informed the Commission that the units were not habitable because they lacked water, a sewage system, electricity, and paved road access.

The Commission held a compliance hearing in July 2010, at which both Bridge and DW appeared. DW admitted that it lacked the money to build on the remaining 1,000 acres. The State Office of Planning requested that the Commission reopen the OSC and advocated for reversion so

that a "bona fide developer" could make a new proposal. All commissioners voted to reinstate the OSC, scheduled an OSC hearing, and entered a finding that the condition precedent had not been satisfied. About two weeks thereafter, the Commission issued an order reinstating the OSC and reiterating the 2005 Order's November 17, 2010 deadline to obtain 385 affordable housing unit occupancy certificates. Bridge contends that after the reinstatement, DW failed to make the additional $35.7 million in payments for the remaining urban land as contemplated by the modified December 2009 agreement.

Bridge and DW moved to bar action on the OSC, arguing that the Commission's enforcement actions, starting with the OSC, violated various Hawaii statutes and administrative rules. At the conclusion of a second OSC hearing, however, five commissioners voted to revert the land. With the approval of a sixth commissioner, the Commission issued a final reversion order (the Reversion Order) on April 25, 2011.

The Reversion Order found that Bridge and DW had failed to comply with the 2005 Order's affordable housing condition, specifically noting that Bridge and DW had not completed 385 affordable housing units by the deadline and were unlikely to do so in the near future. Although the order acknowledged that Bridge and DW had constructed sixteen affordable housing units, the order determined that there was no infrastructure connected to them. The order outlined violations of the 1991 Order's substantial compliance condition based on representations made to the Commission between 2005 and 2010. The order also found that Bridge's and DW's procedural due process rights were not violated because they had received a full and fair opportunity to

present their case.  The order declined to resolve Bridge's equal protection challenge.

At the time of the Reversion Order, DW had purchased only the 60-acre affordable housing parcel while Bridge still owned the remaining 1,000 acres.  The closing dates for the remaining 1,000 urban acres had passed several months earlier without DW making the additional $35.7 million in agreed-upon payments to Bridge.

## II. The Direct Agency Appeal of the Reversion Order

Bridge and DW appealed the Reversion Order to a Hawaii circuit court.  Although the court declined to preliminarily stay the Reversion Order, the court issued an amended final judgment in June 2012 in Bridge's favor.  The court determined that the Commission had violated various Hawaii statutory procedural requirements in issuing the Reversion Order.  The court also determined that the process by which the Commission issued the order violated Bridge's and DW's federal and state constitutional due process and equal protection rights.  Thus, the circuit court vacated the Reversion Order and voided the OSC.

On appeal, the Hawaii Supreme Court affirmed in part and vacated in part the circuit court's judgment.  The Hawaii Supreme Court acknowledged the Commission's authority to revert the land use classification, as well as the propriety of the December 2008 OSC.  *DW Aina Leʻa Dev.*, 339 P.3d at 711, 713.  The court, however, affirmed the circuit court's determination that the Reversion Order violated applicable statutory procedural requirements.

The Hawaii Supreme Court explained that a reversion may or may not be subject to certain procedural requirements.  *Id.* at 709–10.  If a petitioner fails to

substantially commence use of the land in accordance with its representations, then the Commission may revert a land use classification pursuant to Hawaii Revised Statute § 205-4(g) subject to a limited procedure. *Id.* at 710. However, if a petitioner has substantially commenced use, the Commission must follow the requirements of Hawaii Revised Statute § 205-4(h). *Id.* at 689, 714. The court determined that Bridge and DW had substantially commenced use after the Commission rescinded the OSC because DW actively prepared development plans and constructed sixteen affordable housing units by March 31, 2010. *Id.* at 712–14. Thus, the Commission had to find within 365 days of the OSC's initial issuance and by a "clear preponderance of the evidence" that reversion was reasonable, did not violate Hawaii Revised Statute § 205-2 and was otherwise consistent with the policies and criteria set forth in Hawaii Revised Statute §§ 205-16 and 205-17. *Id.* at 714; *see also* Haw. Rev. Stat. § 205-4(h). The Commission had failed to do so. *DW Aina Le'a Dev.*, 339 P.3d. at 714.

The Hawaii Supreme Court vacated the remainder of the circuit court's judgment. With respect to the due process ruling, the Hawaii Supreme Court concluded that Bridge and DW had received notice and a meaningful opportunity to be heard before the reversion. *Id.* at 716. Noting that "the land had changed hands numerous times," that the Commission "had amended the original reclassification order on multiple occasions," and the "long history of unfulfilled promises made in connection with the development of this property," the court determined that the reversion was not "arbitrary and unreasonable." *Id.* at 717. With respect to equal protection, the court could not find that the Commission lacked a rational basis for its treatment of Bridge and DW "[g]iven the long history of this property and the

[Commission's] dealings with the landowners over the course of many years." *Id.* at 718. The court otherwise reasoned that the Commission acted pursuant to its broad statutory authority to impose conditions and its related authority to enforce such conditions. *Id.* The court remanded for proceedings consistent with its decision. *Id.*

## III.    The Proceedings in this Case

Although Bridge and DW together pursued the agency appeal, Bridge alone sued the Commission and commissioners in Hawaii state court in June 2011.[4] Bridge's eleven-count complaint for declaratory, injunctive, and monetary relief raised federal and state constitutional due process, equal protection, and taking claims. Bridge sued all commissioners in their official capacities and sued the six commissioners who had voted for the Reversion Order in their individual capacities as well. Alleging that the $40.7 million DW agreed to pay for the 1,060 acres was the land's fair market value, Bridge claimed "not less" than $35.7 million in damages.

The State removed the case to federal court and moved to dismiss. Before ruling on that motion, the district court ordered a stay of the proceedings pending the agency appeal, an order which the parties cross-appealed to our court. After the Hawaii Supreme Court's decision, we remanded to the

---

[4] DW sued the Commission in Hawaii state court in 2017, asserting federal and state constitutional taking claims. After the case's removal to federal court, a district court dismissed DW's claims as barred by the Hawaii statute of limitations. Our court has certified to the Hawaii Supreme Court a question regarding the proper statute of limitations for a taking claim raised pursuant to Hawaii law. *See DW Aina Le‘a Dev., LLC v. Haw. Land Use Comm'n*, 918 F.3d 602, 609 (9th Cir. 2019) (certification order).

district court.  *Bridge Aina Le'a, LLC v. Chock*, 590 F. App'x 705 (9th Cir. 2015) (unpublished).

On remand, the district court granted the State's motion to dismiss, which concerned only some of Bridge's claims. The court dismissed Bridge's due process and equal protection claims, reasoning that the Hawaii Supreme Court's decision barred re-litigation of the same issues. Applying the doctrine of quasi-judicial immunity, the court dismissed Bridge's individual capacity claims against the commissioners who voted for reversion.  Ultimately, only Bridge's taking claims proceeded to trial on the theory that the reversion was an unconstitutional regulatory taking pursuant to the analyses in *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992), and *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978).

A jury trial was held between March 13 and 23, 2018. After Bridge put on its case-in-chief, the State moved for JMOL on the grounds that Bridge had not established either a *Lucas* or *Penn Central* taking and, even if it had, Bridge should receive only nominal damages because Bridge lacked admissible evidence of just compensation.  The district court granted the motion as to nominal damages but denied it as to taking liability.   Using the 1,060 acres subject to the Reversion Order as the relevant property denominator at the court's instruction, the jury found that a taking occurred pursuant to both *Lucas* and *Penn Central*.  The district court entered judgment for Bridge and awarded $1 in nominal damages.

Following the entry of judgment, the State renewed its JMOL motion and alternatively requested a new trial using 3,000 acres as the property denominator.  The parties cross-appealed the judgment during the pendency of the renewed

motion, and the appeals became effective upon the district court's denial of that motion.  The State timely appealed the denial.

## JURISDICTION AND STANDARDS OF REVIEW

We have jurisdiction over the appeals from the final judgment pursuant to 28 U.S.C. § 1291.  We also have jurisdiction over the appeal from the previously nonfinal orders that have merged with the final judgment, *Hall v. City of Los Angeles*, 697 F.3d 1059, 1070–71 (9th Cir. 2012), and over the denial of the renewed JMOL motion, *Wadler v. Bio-Rad Labs., Inc*., 916 F.3d 1176, 1185 (9th Cir. 2019).

We review de novo the denial of a renewed JMOL motion.  *Reese v. County of Sacramento*, 888 F.3d 1030, 1036 (9th Cir. 2018).  "'[W]hen reviewing a motion for judgment as a matter of law, we apply the law as it should be, rather than the law as it was read to the jury,' even if the party did not object to the jury instructions."  *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009) (en banc) (alteration in original) (quoting *Pincay v. Andrews*, 238 F.3d 1106, 1109 n.4 (9th Cir. 2001)).  A renewed JMOL motion "is properly granted only if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict."  *Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc) (internal quotations and citation omitted).  "A jury's verdict must be upheld if it is supported by . . . evidence adequate to support the jury's conclusion, even if it is also possible to draw a contrary conclusion."  *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002).

We review de novo the dismissal of a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), *United States ex*

*rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 676 (9th Cir. 2018), as well as the district court's issue preclusion ruling, *Garity v. APWU Nat'l Labor Org.*, 828 F.3d 848, 854 (9th Cir. 2016) (citation omitted).

## ANALYSIS

### I.  The State's Renewed JMOL Motion on Bridge's Taking Claims

Our core focus in this appeal is the district court's denial of the State's renewed JMOL motion on Bridge's *Lucas* and *Penn Central* taking challenges to the reversion pursuant to the Fifth Amendment's Takings Clause.[5]  As we explain, as matter of law, Bridge's evidence failed to establish a taking pursuant to either.  Accordingly, it is unnecessary for us to consider the other taking issues that the parties raise on appeal.

#### A. The Fifth Amendment Regulatory Takings Framework

"The Takings Clause of the Fifth Amendment states that 'private property [shall not] be taken for public use, without

---

[5] Bridge also asserted takings claims pursuant to the Hawaii Constitution, which provides that "[p]rivate property shall not be taken or damaged for public use without just compensation."  Haw. Const. art. 1, § 20.  The Hawaii Supreme Court has endorsed federal regulatory takings jurisprudence in determining whether government action is a taking in violation of the Hawaii Constitution.  *Leone v. County of Maui*, 404 P.3d 1257, 1270–71 (Haw. 2017) (acknowledging the *Lucas* and *Penn Central* tests).  Because Bridge raises no distinct and separate arguments regarding its state law takings claims and given the Hawaii Supreme Court's reliance on the federal regulatory takings framework, our *Lucas* and *Penn Central* analyses apply equally to Bridge's state law takings claims.

just compensation." *Knick v. Twp. of Scott*, 139 S. Ct. 2162, 2167 (2019) (alterations in original). By its terms, the clause "does not prohibit the taking of private property," but instead requires "compensation in the event of [an] otherwise proper interference amounting to a taking." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314, 315 (1987). A classic taking occurs when the "government directly appropriates private property or ousts the owner from his domain." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005).

Beyond a classic taking, the Supreme Court has recognized that "if regulation goes too far it will be recognized as a taking." *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). There are three types of regulatory action the Court has recognized, "each of which 'aims to identify regulatory actions that are functionally equivalent to the classic taking.'" *Cedar Point Nursery v. Shiroma*, 923 F.3d 524, 530–31 (9th Cir. 2019) (quoting *Lingle*, 544 U.S. at 539). Two types of regulatory actions—*Loretto* and *Lucas* takings—are *per se* takings.**[6]** *Id.* at 531. *Penn Central* takings are the third type of regulatory taking. *Id.*

Generally, courts determine whether a regulatory action is functionally equivalent to the classic taking using "essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe*

---

**[6]** A *Loretto* taking occurs "where government requires an owner to suffer a permanent physical invasion of her property." *Lingle*, 544 U.S. at 538 (citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)). This "relatively narrow" *per se* rule requires the government to provide compensation, however minor the physical invasion. *Id.* Bridge's land did not suffer a permanent physical invasion, and thus *Loretto* does not apply.

*Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (citations and internal quotation marks omitted). These inquiries are set forth in the three *Penn Central* factors: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central*, 438 U.S. at 124.

Certain regulatory actions, however, are treated categorically as a taking without the necessity of the *Penn Central* inquiry. The *Lucas* rule "applies to regulations that completely deprive an owner of '*all* economically beneficial us[e]' of her property." *Lingle*, 544 U.S. at 538 (alteration in original) (quoting *Lucas*, 505 U.S. at 1019). Government regulations that constitute such a taking are typically those that require land to be left substantially in its natural state. *Lucas*, 505 U.S. at 1018. This is a "relatively narrow" and relatively rare taking category, *Lingle*, 544 U.S. at 538, confined to the "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted," *Lucas*, 505 U.S. at 1017 (emphasis in original).**[7]** Compensation is required in such a case unless the government can show that underlying principles of state property or nuisance law would have led to the same outcome as the challenged regulation. *See Tahoe-Sierra*, 535 U.S. at 330; *Lucas*, 505 U.S. at 1029.

Here, the jury made dual findings that there was an unconstitutional taking of Bridge's property pursuant to both

---

**[7]** One review of some 1,700 taking cases in state and federal courts decided over 25 years identified only 27 cases in which a landowner successfully brought a *Lucas* claim, *i.e*. 1.6%. *See* Carol N. Brown & Dwight H. Merriam, *On the Twenty-Fifth Anniversary of Lucas: Making or Breaking the Takings Claim*, 102 IOWA L. REV. 1847, 1849–50 (2017).

*Lucas* and *Penn Central*.  The district court determined that either finding independently supported the verdict.

We underscore at the outset that when "a regulation 'denies all economically beneficial or productive use of land,' the multi-factor analysis established in *Penn Central* is not applied" because *Lucas* supplies the relevant rule. *Esplanade Props., LLC v. City of Seattle*, 307 F.3d 978, 984 (9th Cir. 2002) (quoting *Lucas*, 505 U.S. at 1027)).  When "a regulation places limitations on land that fall short of eliminating all economically beneficial use, a taking nonetheless may have occurred, depending on" the *Penn Central* framework.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 617 (2001) (citing *Penn Central*, 438 U.S. at 124). Thus, if the jury could find that the reversion deprived Bridge of *all* economically beneficial uses of the 1,060 acres, then *Penn Central* was inapplicable.  Only if the reversion fell short of a total taking was application of *Penn Central* necessary.  We apply this approach in considering the State's arguments.

## B.  *Lucas* Taking

Although the State raises several challenges to the jury's *Lucas* finding, the State's core challenges to that finding are that the land retained substantial residual value in its agricultural use classification and that this classification still allowed Bridge to use the land in economically beneficial ways.  We agree and thus decline to reach the State's alternative challenges to the jury's *Lucas* finding.

We recognize that shortly after the Supreme Court announced the *Lucas* rule, we remarked that "the term 'economically viable use' has yet to be defined with much precision." *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 616 (9th Cir. 1993).  Acknowledging the lack of precision in

this concept, we stated that "the value of the subject property" is "relevant" to the *Lucas* inquiry, but we rejected "focusing solely on property values." *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 95 F.3d 1422, 1433 (9th Cir. 1996), *aff'd*, 526 U.S. 687 (1999). Pointing to this passage in *Del Monte Dunes*, Bridge urges us to reject the State's arguments regarding the role of value in the *Lucas* context.

Subsequent developments in the Supreme Court's takings decisions, however, lead to three observations that guide our resolution of the parties' arguments here. First, the Court has made clear that "[i]n the *Lucas* context, . . . the complete elimination of a property's value is the *determinative* factor." *Lingle*, 544 U.S. at 539 (emphasis added). As the Court has underscored, "the categorical rule in *Lucas* was carved out for the 'extraordinary case' in which a regulation permanently deprives property of all value." *Tahoe-Sierra*, 535 U.S. at 332. "Anything less than a 'complete elimination of value,' or a 'total loss' . . . would require the kind of analysis applied in *Penn Central*." *Id.* at 330 (quoting *Lucas*, 505 U.S. at 1019 n.8). Second, although value is determinative, use is still relevant. *See Murr v. Wisconsin*, 137 S. Ct. 1933, 1949 (2017) (concluding that the challenged regulations did not deprive the landowners of all economically beneficial use because "[t]hey can use the property for residential purposes" and "[t]he property has not lost all economic value"). Finally, the Court has clarified that a token interest will not defeat a *Lucas* claim. *See Palazzolo*, 533 U.S. at 631 ("Assuming a taking is otherwise established, a State may not evade the duty to compensate on the premise that the landowner is left with a token interest."). Guided by these observations, we conclude that Bridge's evidence did not satisfy *Lucas*.

### 1. The Land Retained Substantial Economic Value

We turn first to the land's value.  Bridge relied on the expert testimony of Steven Chee to opine on the fair market value of the 1,060 acres in the urban and agricultural land use classifications before and after reversion.  Chee expressly assumed that the 2009 Voice Vote on April 30, 2009 reverted the land.  Although this assumption is demonstrably wrong, this testimony is the only valuation evidence in the record.  We therefore address the argument as Bridge frames it.

Chee appraised the fair market value of the 1,060 acres by determining the highest and best use of the land in each classification, a metric "shaped by the competitive forces within the market where the property is located."  First, Chee opined that the land had a value of $40 million on April 29, 2009 in an urban classification based on land banking until market conditions improved given the significant off-site work necessary before the land could be developed and the ongoing impacts of the Great Recession.  Second, Chee opined that the land had a value of $6.36 million on April 30, 2009 in an agricultural classification.  Although Chee did not presume that reclassification would be obtained, the agricultural use valuation accounted for land banking while simultaneously attempting to regain the former urban classification.[8]  The difference reflects an 83.4 % diminution in value.

---

[8] We understand Chee's evidence to account for a realistic probability that the urban classification would be regained based on Chee's trial testimony that an appraiser will consider the possibility of rezoning if it "looks highly realistic."  In actuality, we also know that

The State contends that this evidence shows that the land retained substantial residual value in an agricultural use classification and that any diminution in value was less than the land's total value.  We agree.  Absent more, there is no *Lucas* liability for this less than total deprivation of value. *See Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1347 (Fed. Cir. 2004) (concluding that a 92% loss of value in one part of the land and a 78% loss in another part "is manifestly insufficient" under *Lucas*); *Cienega Gardens v. United States*, 331 F.3d 1319, 1344 (Fed. Cir. 2003) (concluding that *Lucas* requires a loss of "100% of a property interest's value"); *Cooley v. United States*, 324 F.3d 1297, 1305 (Fed. Cir. 2003) ("Contrary to the trial court's holding, the record shows that the 1993 denial apparently destroyed less than all of Cooley's property's value, which constitutes a non-categorical taking.  The categorical takings directives of *Lucas* do not apply.").

In rejecting the State's arguments, the district court reasoned that value was relevant to but not dispositive of the *Lucas* inquiry by relying on our discussion on value versus use in *Del Monte Dunes*.  This was error because, as we have explained, the Supreme Court's precedents underscore that value is determinative.  *See Lingle*, 544 U.S. at 539; *Tahoe-Sierra*, 535 U.S. at 330.  We have stated as much in a decision that the district court acknowledged but interpreted as irrelevant.  *See Horne v. U.S. Dep't of Agric.*, 750 F.3d 1128, 1141 n.17 (9th Cir. 2014) ("*Lucas* plainly applies only when the owner is deprived of *all* economic benefit of the property.  If the property retains any residual value after the regulation's application, *Penn Central* applies." (citation

---

Bridge did regain the conditional urban classification roughly a year after the reversion because of the circuit court's judgment.

omitted) (emphasis in original)), *overruled on other grounds by Horne v. Dep't of Agric.*, 135 S. Ct. 2419 (2015).

The district court also wrote off the substantial residual value that Bridge's evidence found in the land's agricultural use classification by pointing to our observation in *Del Monte Dunes* that if "no competitive market exists for the property without the possibility of development, a taking may have occurred." 95 F.3d at 1433.  The district court read this passage to mean that the jury could find that *Lucas* applied here if no competitive market existed for the land without a change in the regulation.  Bridge reprises this reasoning here.

*Del Monte Dunes* does not control here.  There, we determined that "the mere fact that there is one willing buyer of the subject property, especially where that buyer is the government, does not, as a matter of law, defeat a taking claim" when the "government action relegates permissible uses of property to those consistent with leaving the property in its natural state (e.g., nature preserve or public space)." *Id*. at 1433.  Thus, the fact that the government purchased the land subject to the challenged regulation that the government put in place did not defeat a *Lucas* theory.  Unlike in *Del Monte Dunes*, the Commission neither attempted to buy the subject property, nor was Bridge captive to a single buyer exercising its regulatory power.  Moreover, the Commission thought that reversion would encourage Bridge to sell the property so that a new developer could make a new proposal, suggesting that Bridge could have sold the land in a competitive market with a possibility of a regulatory change.

In the end, the relevant inquiry for us is whether the land's residual value reflected a token interest or was attributable to noneconomic use. *See Palazzolo*, 533 U.S. at 631 (concluding that a 93% loss in value was insufficient for

*Lucas* because the value was attributable to economic use, specifically residential use); *Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1115–17 (Fed. Cir. 2015) (concluding that the *Lucas* rule applied to a 99.4% deprivation because the residual value was attributable to noneconomic uses). We do not think either situation applies here.

The land's $6.36 million value in an agricultural use classification was neither *de minimis*, nor did the value derive from noneconomic uses. Bridge's expert valued the land in a competitive market using pricing for similarly situated properties, and expressly accounted for the possibility of regaining the urban use classification. *Lucas* does not apply when "substantial present value" stems from "future use" of the land. *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 216 F.3d 764, 781 n.26 (9th Cir. 2000), *overruled on other grounds by Gonzalez v. Arizona*, 677 F.3d 383 (9th Cir. 2012). Thus, the land's value in the agricultural use classification precludes a *Lucas* finding here.

## 2. The Reversion Did Not Deprive Bridge of All Economically Viable Uses of the Land

As a secondary matter, the permissible uses of land classified as agricultural reinforce our conclusion that the reversion did not completely deprive Bridge of all economically viable uses of the 1,060 acres as a matter of law. "[T]he *existence* of permissible uses determines whether a development restriction denies a property owner economically viable use of his property." *Del Monte Dunes*, 95 F.3d at 1432 (emphasis added); *Outdoor Systems*, 997 F.2d at 616. "[W]here an owner is denied *only some* economically viable uses, a taking still may have occurred" pursuant to the *Penn Central* analysis, but not pursuant to the

*Lucas* rule.  *Del Monte Dunes*, 95 F.3d at 1432 (emphasis added).

Hawaii law permits an array of uses for land classified as agricultural.  *See* Haw. Rev. Stat. § 205-2(d)(1)–(16).**[9]**  In addition, a landowner may obtain a permit for "certain unusual and reasonable uses within agricultural . . . districts other than those for which the district is classified."  *Id.* § 205-6(a).    There are no express limitations on such specially permitted uses.**[10]**  Against this statutory backdrop, we do not see how this case is like *Lucas*.  The mere reclassification of the 1,060 acres from urban use to an agricultural use did not prohibit all development, nor did it

---

**[9]** These uses include: (1) crop cultivation activities and uses; (2) farming activities or uses related to animal husbandry and game and fish propagation; (3) aquaculture (*i.e.*, the production of aquatic plant and animal life within ponds); (4) wind-generated energy production for public, private, and commercial use; (5) biofuel production for public, private, and commercial use; (6) solar energy facilities; (7) bona fide agricultural activities and uses that support such activities, including accessory buildings; (8) wind machines and wind farms; (9) small-scale meteorological, air quality, noise, and other scientific and environmental data collection; (10) agricultural parks; (11) agricultural tourism conducted on a working farm, or a farming operation; (12) agricultural tourism activities; (13) open area recreational facilities, (14) geothermal resources exploration, (15) agricultural-based commercial operations registered in Hawaii; and (16) hydroelectric facilities.  *See* Haw. Rev. Stat. § 205-2(d).

**[10]** Trial testimony showed that prior examples of specially permitted uses in an agricultural district included: rock quarrying operations; cinder and sand mining facilities; concrete batching plants; construction waste facilities; landfills; public and private sewage treatment plants; gardens and zoos; schools (pre-kindergarten to college); memorial parks, including crematoria, commercial facilities, including post offices and gas stations; private storage facilities; construction yards; maintenance facilities; and telecommunications facilities and structures.

require leaving the land in an idle state.  *See Lucas*, 505 U.S. at 1008.

Although Bridge offered evidence suggesting that many of the statutorily permitted uses would not have been economically feasible, Bridge did not address *all* of the statute's permitted uses or account for any of the uses for which the Commission had granted special permits in the past, such as a sewage treatment plant or rock quarrying. Some of the specially permitted uses may have been especially suitable for this land.  Bridge intended to place a sewage treatment plant on the adjacent 2,000 acres of agriculturally zoned land.  Bridge's own witnesses also recognized that the land was "good for growing rocks." Based on the evidence that Bridge presented, we do not think that the jury could have reasonably found that the reversion deprived Bridge of *all* economically feasible uses of the land.

Bridge otherwise draws our attention to the Commission's findings in the 1989 and 1991 Orders that the soils were rated poorly and were not adequate for grazing to suggest that there were no viable uses in an agricultural use zone.  By definition, however, "[a]gricultural districts include areas that are not used for, or that are not suited to, agricultural and ancillary activities by reason of topography, soils, and other related characteristics."  Haw. Rev. Stat. § 205-2(d).  Thus, the Commission's findings are simply not evidence that the land lacked economically viable uses in an agricultural classification.

Ultimately, we think that the notion underlying Bridge's *Lucas* theory is that the inability to pursue a particular development and to obtain its value was a total taking.  This view is unsupported by the law.  *See Palm Beach Isles Assocs. v. United States*, 231 F.3d 1354, 1364 (Fed. Cir.

2000) (order) ("[M]ost land use restrictions do not deny the owner of the regulated property all economically viable uses of it."); *Hoehne v. County of San Benito*, 870 F.2d 529, 532–33 (9th Cir. 1989) ("A government entity is not required to permit a landowner to develop property to the full extent it may desire.  Denial of the intensive development desired by a landowner does not preclude less intensive, but still valuable development.").  Accordingly, we conclude that the State was entitled to judgment as a matter of law on Bridge's *Lucas* theory, and we turn to the *Penn Central* analysis.

## C.  Penn Central Taking

*Penn Central* requires that we consider: (1) "[t]he economic impact of the regulation on the claimant," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action."   438 U.S. at 124.   Our consideration of these factors aims "to determine whether a regulatory action is functionally equivalent to the classic taking." *Guggenheim v. City of Goleta*, 638 F.3d 1111, 1120 (9th Cir. 2010) (en banc) (internal quotation marks omitted). The first and second *Penn Central* factors are the primary factors. *Lingle*, 544 U.S. at 538–39.  "The outcome [of this inquiry] . . . depends largely upon the particular circumstances [in the] case" at hand.  *Palazzolo*, 533 U.S. at 633 (O'Connor, J., concurring) (quoting *Penn Central*, 438 U.S. at 124) (internal quotation marks omitted).  When we apply the *Penn Central* factors to the trial evidence, we conclude that the jury could not reasonably find for Bridge.

### 1.  The Reversion Order's Economic Impact

Our first consideration is the challenged regulation's economic impact on the property owner.  *Lingle*, 544 U.S. at

528. "[W]e 'compare the value that has been taken from the property with the value that remains in the property.'" *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (quoting *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 497 (1987)), *cert. denied*. 139 S. Ct. 917 (2019).  Although there is "no litmus test," *id.* at 451, our value comparison again aims "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owners from his domain," *Lingle*, 544 U.S. at 539.

Bridge attempted to show the reversion's economic impact by relying on Chee's valuation testimony and on testimony regarding the disruption to the sale agreements between Bridge and DW.  We address each in turn.

### a.  The Valuation Opinion

As we have explained, Chee calculated the fair market value of the land using the day of the 2009 Voice Vote as the relevant point at which the land reverted.  Chee calculated the land's value as $40 million on the day before the vote and as $6.36 million on the day of the vote.  The parties agree, uncritically, that Chee's opinion shows that the land suffered an 83.4% diminution in fair market value.  On this account, the reversion would have resulted in a loss of $33.6 million in the land's value.  We conclude, however, that, as a matter of law, Chee's calculation suffers from a number of defects for the purposes of Bridge's taking claim.

First, Chee's valuation opinion did not properly ascertain economic impact for the purposes of Bridge's taking claim because it assumed that the April 30, 2009 Voice Vote

reverted the land.[11]  We have already explained that it is not proper to measure economic impact based on a "hypothetical economic result" that assumes a state of affairs that did not exist.  *See MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013) (rejecting the district court's comparison of the effect of a 1999 rent control ordinance with a "hypothetical economic result assuming that there was no rent control ordinance in effect at all").   The reversion did not occur until some two years after the 2009 Voice Vote and thus the vote could not be the proper reference point.

Second, the vote's effect on the land's fair market value during the ongoing OSC proceedings is not evidence of a taking.  We understand that Bridge could account for what it contends cast a "dark cloud" over the project by using the vote as the reference point for its valuation calculation. Nevertheless, "[m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are incidents of ownership.   They cannot be considered as a taking in the constitutional sense." *Tahoe-Sierra*, 535 U.S. at 332 (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9 (1980)); *First English*, 482 U.S. at 320 (same).  Chee's valuation evidence falters for this reason as well.

---

[11] We observe that it appears that Chee's calculation of the land's value prior to voice vote failed to account for Bridge's November 2010 deadline to complete the 385 affordable housing units.  Chee calculated the land's urban value as \$40 million based on the "highest and best use" of "'land banking' the property until overall market conditions improved," specifically waiting to gauge "the full fallout of the Great Recession."  Thus, Chee's highest and best use valuation of the land in its urban classification also appears to have inflated the land's value.

Third, even if we assume that Chee properly calculated the land's value, the asserted 83.4% diminution in value substantially overstates the relevant diminution in value Bridge could have suffered for the purposes of weighing this factor. *See MHC Fin.*, 714 F.3d at 1127 (taking issue with valuation evidence based on a hypothetical state of affairs but nevertheless assuming it could show economic impact). "[T]he duration of the restriction is one of the important factors that a court must consider in the appraisal of a regulatory takings claim." *Tahoe-Sierra*, 535 U.S. at 342. When we account for the reversion's temporary duration, the resulting relevant diminution is much smaller than 83.4%.

We observe that, consistent with the nature of its temporary taking claim, Bridge did not attempt to pursue at trial damages that would reflect the full 83.4% diminution it asserted.[12]  Instead, Bridge sought damages by taking (1) the diminution in the land's value attributed to the government action, (2) multiplied by the time period of the temporary taking, and (3) further multiplied by Bridge's rate of return. Using an overstated taking period from the date of the 2009 Voice Vote to the Hawaii Supreme Court's November 2014 decision, Bridge asserted that the relevant time period for its

---

[12] In a temporary regulatory taking case, just compensation damages are modified because "the landowner's loss takes the form of an injury to the property's potential for producing income or an expected profit," not the loss of the property itself. *Wheeler v. City of Pleasant Grove*, 833 F.2d 267, 271 (11th Cir. 1987).  In these circumstances, "[t]he landowner's compensable interest . . . is the return on the portion of fair market value that is lost as a result of the regulatory restriction. Accordingly, the landowner should be awarded the market rate return computed over the period of the temporary taking on the difference between the property's fair market value without the regulatory restriction and its fair market value with the restriction." *Id.* (citing *Nemmers v. City of Dubuque*, 764 F.2d 502, 505 (8th Cir. 1985)).

damages was 5.68 years.  Seeking to apply a 10.12% rate of return to the $40 million valuation, Bridge claimed damages of $19.54 million. That is a roughly 48% diminution in value.

More critically, Bridge's claimed damages still overstate the relevant diminution in value for the purposes of this factor.   The reversion lasted roughly a year, from the Reversion Order's issuance in April 2011 until the Hawaii state circuit court's judgment vacating the order in June 2012.[13]  *See DW Aina Le'a Dev.*, 339 P.3d at 704.  When we account for the reversion's actual one-year duration, Bridge's damages are at most $6.72 million if we use the higher 20% rate of return that Bridge hoped to receive on its total investment (an issue we discuss in further detail below).  Bridge's loss thus amounts to an approximately 16.8% diminution in value, a number far lower than the 83.4% figure on which it relied at trial.   This economic impact weighs against the conclusion that the reversion constituted a taking.   *See Colony Cove Props.*, 888 F.3d at 451 (concluding that a 24.8% diminution was "far too small to establish a regulatory taking"); *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1189 (9th Cir. 2012) (finding that a "less than 15%" economic loss with respect to one property and no effect on two other properties "does not support a takings claim").

---

[13] Bridge treats the Hawaii Supreme Court's decision as *the* decision that invalidated the Reversion Order.  We know of no principle of Hawaii law that would render ineffective the Hawaii circuit court's judgment vacating the Reversion Order.  The general rule is that "an appeal does not vacate the judgment appealed from."  *Solarana v. Indus. Elecs., Inc.*, 428 P.2d 411, 417 (Haw. 1967).  Thus, the circuit court's judgment is the relevant end point.

For these reasons, we conclude that the valuation evidence, properly understood, weighs strongly against a taking pursuant to the first *Penn Central* factor.

### b.  The Disrupted Sale Agreements

Bridge also relied on the disruption of the land sale agreements between it and DW to show economic impact. John Baldwin, the CEO of Bridge Capital and Bridge's parent company as well as Bridge's manager, testified that DW failed to purchase the remaining 1,000 acres for the $35.7 million price stated in the February 2009 sale agreement because of the vote.  Apparently, the vote affected DW's ability to borrow money to finance the purchase. Baldwin further testified that DW failed to make any more payments to Bridge pursuant to the modified December 2009 agreement—which retained the same $35.7 million price for the remaining 1,000 acres—after the OSC's reinstatement.

There is a fundamental problem with using the claimed disruptions to the February 2009 and December 2009 sale agreements as evidence of the Reversion Order's economic impact.  DW's contractual default under the February 2009 agreement after the 2009 Voice Vote occurred some two years *before* the 2011 Reversion Order.  DW's default under the modified December 2009 agreement also occurred after the OSC's reinstatement in July 2010, several months *before* the Reversion Order's issuance.  The Reversion Order thus could not have caused the contractual defaults that pre-dated it by several months.  *See Esplanade Props.*, 307 F.3d at 984 (citing *Tahoe-Sierra*, 216 F.3d at 783 & n.33) (recognizing that a regulatory taking plaintiff must establish both causation-in-fact and proximate causation).  Moreover, the record otherwise shows that Bridge's focus on the disruptions to these agreements overstated the reversion's impact on its contractual relationship with DW.  After the

Hawaii Supreme Court's decision, DW agreed to pay Bridge $14 million more than the previously agreed upon $40.7 million to purchase the land. Thus, the contractual defaults during the reversion's temporary duration do not affect our economic impact analysis.

### 2. The Extent of Any Interference with Any Reasonable Investment-Backed Expectations

We must consider next "the extent to which the regulation has interfered with distinct investment-backed expectations," *Penn Central*, 438 U.S. at 124, that Bridge had for the 1,060 acres at the time of its acquisition, *see Colony Cove Props*, 888 F.3d at 452; *Laurel Park Cmty*, 698 F.3d at 1189. Although this factor raises "vexing subsidiary questions" about its proper scope and application, *Lingle*, 544 U.S. at 539, certain principles guide us.

For one, we must "use 'an objective analysis to determine the reasonable investment-backed expectations of the [o]wners.'" *Colony Cove Props.*, 888 F.3d at 452 (quoting *Chancellor Manor v. United States*, 331 F.3d 891, 907 (Fed. Cir. 2003)). Our focus is on interference with reasonable expectations. *See Concrete Pipe & Prods*., 508 U.S. at 646; *Ruckelshaus v. Monsanto Co*., 467 U.S. 986, 1005 (1984). "'Distinct investment-backed expectations' implies reasonable probability, . . . not starry eyed hope of winning the jackpot if the law changes." *Guggenheim*, 638 F.3d at 1120 (quoting *Penn Central*, 438 U.S. at 124). Thus, "unilateral expectation[s]" or "abstract need[s]" cannot form the basis of a claim that the government has interfered with property rights. *Ruckelshaus*, 467 U.S. at 1005 (citation omitted).

Second, "what is 'relevant and important in judging reasonable expectations' is 'the regulatory environment at

the time of the acquisition of the property.'" *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1345 (Fed. Cir. 2018) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1350 n.23 (Fed. Cir. 2001) (en banc)). "[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end[.]" *Concrete Pipe & Prods.*, 508 U.S. at 645 (quoting *FHA v. The Darlington, Inc.*, 358 U.S. 84, 91 (1958)).

With these principles in mind, we must determine what reasonable investment-backed expectations Bridge had and to what degree the Reversion Order interfered with them.

The record shows that Baldwin testified that Bridge hoped to make annually at least 20% from "the total investment," meaning every dollar put into the property.[14] Even if this hoped-for return was reasonable, the reversion could not have meaningfully interfered with it during the reversion's one-year duration. Bridge did not expect any profit from its purchase of the property unless and until the Commission amended the 1991 Order's affordable housing condition. Bridge also did not expect that an amendment to the affordable housing condition would translate into immediate profits. Indeed, Bridge represented to the Commission that $86 million in initial infrastructure costs and over $200 million in total development costs had to be spent before the construction and sale of any housing units could begin. At the time of the reversion, the project was

---

[14] The district court denied the State's JMOL motion in part by relying on evidence that Bridge anticipated receiving a 20% return on its initial investment. On appeal, Bridge passingly refers to this in the factual background of its answering brief to the State's cross-appeal and does not argue it in its *Penn Central* analysis. Nevertheless, we address it here.

nowhere near this level of investment—indeed only sixteen affordable housing units existed—and thus Bridge could have had no reasonable expectation of making the 20% annual return on the total investment at that time.

The State and Bridge largely focus on whether Bridge could have reasonably expected that the Commission would amend the 1991 Order's affordable housing condition requiring the construction of 1,000 affordable housing units.[15]  Pointing to our distinction in *Guggenheim*, 638 F.3d at 1120–21, between reasonable expectations and speculative possibilities, both sides find support for the (un)reasonableness of Bridge's expectation in the $5.2 million that Bridge paid for the 1,060 acres.  We will assume that Bridge reasonably expected an amendment to the 1991 Order's affordable housing condition, but we do not see what it proves.  The Commission did not predicate the Reversion Order on a purported failure to build the 1,000 affordable housing units that the 1991 Order required prior to amendment, but instead on the reclassification conditions that Bridge conspicuously ignores.

Bridge further argues that the jury was entitled to find that Bridge had a reasonable expectation that the Commission would not revert the land to its prior zoning for agricultural use once Bridge purchased the property, obtained the amendment, and substantially commenced use of the land.  The substantial commencement of use point stems from the Hawaii Supreme Court's determination that DW's active preparations for the land and completion of

---

[15] The propriety of the Commission's affordable housing conditions is not at issue in this case.  As Bridge avers on appeal, "the 'challenged regulation' giving rise to Bridge's takings claim is *not* the affordable housing condition in effect when Bridge purchased the Property."

sixteen affordable housing units by March 2010 was substantial commencement of use.  But again, we do not see what this proves.  Substantial commencement of use did not eliminate the possibility of reversion; it simply changed the circumstances pursuant to which the Commission could exercise its reversion authority.  *See DW Aina Le'a Dev.*, 339 P.3d at 714.

What we find dispositive are the conditions of the 1989 and 1991 Orders requiring the landowner to substantially comply with representations made to obtain reclassification. The 1991 Order made clear that the Commission might issue an OSC why the land should not revert for failure to substantially comply with representations made to obtain reclassification.   Hawaii law expressly authorized the Commission to impose this condition, and such conditions ran with title to the land.   Haw. Rev. Stat. § 205-4(g). Critically, the substantial compliance condition turned on the *landowner's* own representations to the Commission.

Bridge expressly committed to build 385 affordable housing units as a part of the amendment to the order governing the land's conditional urban use classification. Based on Bridge's representations to the Commission, the 2005 Order required Bridge to build these units by November 2010.  At no point in arguments before us does Bridge acknowledge this deadline, let alone Bridge's and DW's repeated representations to the Commission as part of seeking the OSC's rescission that they would complete the 385 affordable housing units.

The operative conditions in place at the time of the OSC and the Reversion Order, and Bridge's failure to meet them, dispel the notion that Bridge could reasonably expect that the Commission would not enforce the conditions.  *See MHC Fin.*, 714 F.3d at 1127–28 (finding that plaintiff could not

satisfy this factor in the context of challenging a 1999 rent control ordinance because the plaintiff "had even less reason to expect that the rent control regime would disappear altogether" given a prior 1993 rent control ordinance in effect when plaintiff bought its property).  The Commission properly issued the OSC based on the suspicion that Bridge would not meet the conditions.  *See DW Aina Le'a*, *Dev*., 339 P.3d at 713 ("The [Commission] did not err in issuing the OSC.  Bridge and DW do not contend otherwise." (citation omitted)).  And, in fact, Bridge did not complete the 385 affordable housing units by the deadline to do so, which lapsed several months before the Reversion Order's issuance.  Thus, we do not see how the Reversion Order interfered with any reasonable expectations that Bridge could have formed regarding enforcement or reversion.  Accordingly, we conclude that, as a matter of law, this factor weighs strongly against finding a taking.

### 3.  The Character of the Government's Action

Finally, we consider the Reversion Order's character.  "[T]he character of the governmental action—for instance whether it amounts to a physical invasion or instead merely affects property interests through some public program adjusting the benefits and burdens of economic life to promote the common good—may be relevant in discerning whether a taking has occurred."  *Lingle*, 544 U.S. at 539 (internal quotation marks omitted).  The government generally cannot "forc[e] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole."  *Id*. at 537 (quoting *Armstrong v. United States*, 364 U.S. 40, 49 (1960)).  Even if this factor weighs in favor of finding a taking, this factor is not alone a sufficient basis to find that a taking occurred.  *See Laurel Park Cmty.*, 698 F.3d at 1191.

The district court concluded that Bridge's evidence provided the jury with an ample basis to find for Bridge on this factor.  The court reasoned that the Reversion Order's effect was concentrated because it directly affected the owners of the 1,060 acres.  The court also reasoned that credible testimony showed that the Commission intended to cause Bridge to sell the property.  In addition, the court observed that the "decision to revert the Property's classification was the first time in the [Commission's] 50-year history that it had taken such action," and that the Hawaii Supreme Court ultimately invalidated the reversion.  Much of this evidence was insufficient to establish that this factor weighed in Bridge's favor.

For one, we recognize that government action that singles out a landowner from similarly situated landowners raises the specter of a taking.  *See Lingle*, 544 U.S. at 542–44.  The concentrated effect of the reversion here, however, was reflective of the confines of a generally applicable Hawaii law land use reclassification procedure.  *See* Haw. Rev. Stat. § 205-4(a) (permitting a landowner to petition).  We cannot find in this generally applicable scheme that this factor weighed in Bridge's favor.

Second, the Hawaii Supreme Court's invalidation of the reversion as a matter of Hawaii *statutory procedural* requirements does not carry the constitutional significance that either Bridge or the district court ascribed to it.  The reclassification history is critical to the reversion challenged here.  *See Buckles v. King County*, 191 F.3d 1127, 1139 (9th Cir. 1999) (observing that a taking claim must be considered "'in light of the context and . . . history' of the land use decisions related to [the] property." (ellipsis in original) (quoting *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 721 (1999))).

As the Hawaii Supreme Court observed when it rejected Bridge's assertion that the Commission violated Bridge's substantive due process rights, the "reversion was not 'clearly arbitrary and unreasonable,' given the project's long history, the various representations made to the [Commission], and the petitioners' failure to meet deadlines." *DW Aina Leʻa Dev.*, 339 P.3d at 689, 717.  The court otherwise acknowledged that, despite their repeated assurances to the Commission that they would complete the 385 affordable housing units by November 2010, "Bridge and DW did not satisfy the affordable housing condition, and did not comply with numerous other representations made to the [Commission]." *Id.* at 717.  The Hawaii Supreme Court's rejection of Bridge's equal protection challenge echoed this reasoning. *Id.* at 718.  The same underlying history blunts the force of Bridge's assertion that the reversion's character established a taking.

## 4.  The Balance of the *Penn Central* Factors

Although we construe the evidence in the light most favorable to the jury's verdict, we conclude that no reasonable jury could find that Bridge's evidence satisfied the *Penn Central* test.  Even if we assume that the character of the government's action weighs in favor of finding a taking, the first and second factors weigh decisively against such a finding.  Because Bridge's own evidence established a diminution in value that is proportionately too small and because the reversion did not interfere with Bridge's reasonable investment-backed expectations for the land, no reasonable jury could conclude that the reversion effected a taking pursuant to the *Penn Central* analysis.

### D.  The Outcome of the Taking Liability Analysis

Our analysis of Bridge's taking theories requires us to reverse the district court's denial of the State's renewed JMOL motion.  Bridge's evidence could not establish that a taking occurred pursuant to either *Lucas* or *Penn Central*.  Thus, the district court should have granted the State's motion.  We vacate the judgment for Bridge and the nominal damages award and remand with instructions for the district court to enter judgment for the State.  As a consequence of this determination, we need not address any other taking issues the parties raise on appeal.

## II.  The Dismissal of Bridge's Equal Protection Claim

Next, we must determine whether the Hawaii Supreme Court's decision in Bridge's agency appeal barred Bridge's equal protection claim in this case.  Hawaii law governs whether we afford preclusive effect to the Hawaii Supreme Court's decision.  *See Hiser v. Franklin*, 94 F.3d 1287, 1290 (9th Cir. 1996) ("[A] federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the state in which the judgment was rendered." (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.* 465 U.S. 75, 81 (1984))).  Thus, if Hawaii law precludes Bridge from litigating the equal protection claim in state court, then Bridge cannot pursue the same claim here.  *Caldeira v. County of Kauai*, 866 F.2d 1175, 1178 (9th Cir. 1989).

Pursuant to Hawaii law, the "judgment of a court of competent jurisdiction is a bar to a new action in another court between the same parties or their privies concerning the same subject matter."  *Santos v. State Dep't of Transp.*, 646 P.2d 962, 965 (Haw. 1982) (per curiam).  A judgment

has preclusive effect pursuant to the doctrine of issue preclusion if four requirements are met:

> (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there is a final judgment on the merits; (3) the issue decided in the prior adjudication was essential to the final judgment; and (4) the party against whom [issue preclusion] is asserted was a party or in privity with a party to the prior adjudication.

*Bremer v. Weeks*, 85 P.3d 150, 161 (Haw. 2004) (alteration in original); *see also Dorrance v. Lee*, 976 P.2d 904, 909 (Haw. 1999).

The district court determined that all requirements were met. Bridge disputes the first and second requirements and further argues that it did not have a full and fair opportunity to litigate its equal protection challenge in the agency appeal. We reject each argument in turn.

## A. Identical Issues

We can find no material difference between the equal protection issue Bridge raised in the agency appeal and the one raised in this suit. In the agency appeal, Bridge asserted that the Commission violated its equal protection rights because the Commission did not treat other developers the same way it treated Bridge. In its complaint here, Bridge alleged that the Commission lacked a rational basis to treat Bridge differently than it treated other developers. These are undoubtedly the same issue. Bridge's further contention that the Hawaii Supreme Court decided only whether the Commission had a rational basis to enforce the

reclassification conditions ignores that the court determined that any differential treatment did not lack a rational basis. *See DW Aina Le'a Dev.*, 339 P.3d at 717–18.

Furthermore, we disagree with Bridge that Hawaii law requires the availability of identical remedies in both proceedings for an earlier judgment to have preclusive effect. In *Citizens for the Protection of the North Kohala Coastline v. County of Hawai'i*, 979 P.2d 1120 (Haw. 1999), the Hawaii Supreme Court decided that issue preclusion did not bar the suit there because different standards governed the issue of standing to challenge an agency action pursuant to different Hawaii statutory provisions. *See Tax Found. of Haw. v. State*, 439 P.3d 127, 149 (Haw. 2019) ("[I]n *Citizens*, we pointed out the difference between standing requirements for HRS § 91-14 agency appeals and HRS § 632-1 declaratory judgment actions[.]"). The court observed that the statutory provisions provided different forms of relief to bolster the conclusion that issue preclusion did not bar the later suit, not to fashion a new identical remedies requirement for Hawaii issue preclusion law. *See Citizens for the Protection of the North Kohala Coastline*, 979 P.2d  at 1128 (citing *Pele Def. Fund v. Puna Geothermal Venture*, 881 P.2d 1210, 1216 n.13 (Haw. 1994) (further explaining that in a § 91-14 agency appeal, "the court only has power to grant relief in accordance with HRS 91-14(g)")). Thus, we reject Bridge's challenge to the identical issue requirement.

## B.  Final Judgment on the Merits

We also reject Bridge's contention that the Hawaii Supreme Court's decision was not a final judgment on the merits. Insofar as the decision concerned Bridge's federal equal protection rights, the decision became final when the time expired for Bridge to seek review by the United States

Supreme Court.  *See E. Sav. Bank, FSB v. Esteban*, 296 P.3d 1062, 1068 (Haw. 2013); *see also* 28 U.S.C. § 2101 (setting 90-day time period within which to file a writ of certiorari with the United States Supreme Court).  We are not aware of Bridge ever pursuing any such appeal.

Contrary to Bridge's view, the Hawaii Supreme Court's remand for further proceedings consistent with its opinion does not render the judgment nonfinal.  The Hawaii Supreme Court expressly vacated the circuit court's judgment on the issue of equal protection, and remanded for the circuit court to effectuate that vacatur.  That remand could not have resulted in a different resolution of Bridge's equal protection challenge because no issue of law or fact regarding that challenge remained unresolved.  *See Robinson v. Ariyoshi*, 658 P.2d 287, 297 (Haw. 1982).  Moreover, Bridge has never identified any further agency appeal proceedings in the more than five years since the Hawaii Supreme Court's judgment. Thus, the court's decision was a final judgment on the merits.

## C.  Full and Fair Opportunity to Litigate

As a final matter, we consider whether Bridge lacked a full and fair opportunity to litigate its equal protection challenge in the agency appeal.  Federal courts will not afford preclusive effect to a prior state court judgment if the party lacked a full and fair opportunity to litigate the issue on the merits.  *See Allen v. McCurry*, 449 U.S. 90, 101 (1980); *Ross v. Alaska*, 189 F.3d 1107, 1112–13 (9th Cir. 1999).[16]  "[N]o single model of procedural fairness, let alone

---

[16] This parallels a requirement of Hawaii issue preclusion law, pursuant to which the plaintiff must have had a full and fair opportunity

a particular form of procedure, is dictated by the Due Process Clause." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 483 (1982). Instead, "'state proceedings need do no more than satisfy the minimum procedural requirements of the Fourteenth Amendment's Due Process Clause in order to qualify for the full faith and credit guaranteed by federal law.'" *Ross*, 189 F.3d at 1112 (quoting *Kremer*, 456 U.S. at 481). The proceedings at issue here met that standard.

Bridge contends that it lacked a full and fair opportunity to litigate its equal protection challenge in the agency appeal because the Hawaii Supreme Court excluded from the evidence the dockets from the Commission's proceedings involving other property owners on which Bridge sought to rely to show differential treatment. *DW Aina Leʻa Dev.*, 339 P.3d at 689, 714–15. Bridge did not lack the opportunity to present this evidence, but instead failed to properly introduce this evidence into the agency appeal record. *Id.* at 715 & n.18 (finding that Bridge and DW failed to request judicial notice). Bridge's failure to do so does not undermine the judgment's fairness. *See Kremer*, 456 U.S. at 483, 485 (having "little doubt" that the state's procedures were constitutionality sufficient and concluding that the plaintiff's "fail[ure] to avail himself of the full procedures provided by state law does not constitute a sign of their inadequacy").

It is otherwise clear that Bridge received a full and fair opportunity to raise the equal protection challenge in the agency appeal. Bridge raised, briefed, and argued the challenge during the proceedings before the Commission and on appeal before the circuit court and defended the issue before the Hawaii Supreme Court. *See DW Aina Leʻa Dev.*,

---

to litigate the relevant issue on the merits in the earlier case. *Dorrance*, 976 P.2d at 911; *Foytik v. Chandler*, 966 P.2d 619, 627 (Haw. 1998).

339 P.3d at 689, 704–06, 717–18.  Bridge thus received a full and fair opportunity pursuant to both Hawaii law and the federal exception to issue preclusion.  *See Ross*, 189 F.3d at 1112–13 (finding that the plaintiff received a full and fair opportunity to litigate an issue in a prior Alaska state court proceeding when the plaintiff was able to raise as well as fully brief and argue the issue); *Dorrance*, 976 P.2d at 911 (making a similar finding under Hawaii law).  We therefore affirm the district court's issue preclusion ruling that bars Bridge from re-litigating the equal protection issue in this case.

With no remaining viable claims, it is unnecessary for us to address Bridge's appeal from the district court's dismissal of the individual capacity claims Bridge raised against the commissioners who voted to revert.  *Trans-Canada Enters., Ltd. v. Muckleshoot Indian Tribe*, 634 F.2d 474, 476 n.2 (9th Cir. 1980) (declining to address judicial immunity "[i]n view of our holding that no claim for federal relief" existed).

## CONCLUSION

The district court erred in denying the State's JMOL motion because Bridge's evidence did not establish a taking pursuant to either *Lucas* or *Penn Central*, and we reverse the denial.  Consequently, we vacate the judgment for Bridge on the taking claims and remand with instructions for the district court to enter judgment for the State.  We affirm the dismissal of Bridge's equal protection claim.  We decline to address all other issues raised on appeal as unnecessary.

**AFFIRMED IN PART, REVERSED AND VACATED IN PART**, and **REMANDED** with instructions to enter judgment for Defendants-Appellees/Cross-Appellants.   Costs are awarded to Defendants-Appellees/Cross-Appellants.